**UNITED STATES of America,**
**Plaintiff,**

v.

**UNITED STATES GYPSUM COMPANY,**
**et al., Defendants.**

**Civ. No. 8017.**

United States District Court
District of Columbia.
July 6, 1954.

Edward Knuff, Sp. Asst. to the Atty. Gen., Vincent A. Gorman, Lawrence Gochberg, Washington, D. C., Stanley N. Barnes, Asst. Atty. Gen., Charles H. Weston, Sp. Asst. to the Atty. Gen., William D. Kilgore, Jr., Washington, D. C., on the briefs, for the United States.

Samuel I. Rosenman, New York City, Seymour Krieger, Elmer E. Finck and Seymour D. Lewis, New York City, Stanley M. Silverberg, Howard Weinstein, New York City, on the briefs, and Finck & Huber, Buffalo, N. Y., and Rosenman, Goldmark, Colin & Kaye, New York City, of counsel, for National Gypsum Co.

Norman A. Miller, Chicago, Ill., Herbert W. Hirsh, Chicago, Ill., C. Roger Nelson, Washington, D. C., Donald N. Clausen, Chicago, Ill., and Franklin M. Schultz, appeared, Clausen, Hirsh & Miller, Chicago, Ill., on the briefs, and Carson Purcell and Purcell & Nelson, Washington, D. C., of counsel, for Certain-Teed Products Corp.

Benjamin P. DeWitt, New York City, and Joseph S. Rippey, Rochester, N. Y., argued orally; joint briefs were filed for Newark Plaster Co. and for Ebsary Gypsum Co., Inc. by DeWitt, Pepper & Howell, New York City, for petitioners Newark Plaster Co., and Ebsary Gypsum Co., Inc.

Cranston Spray, Chicago, Ill., and Bruce Bromley, New York City, argued orally; Robert C. Keck, Chicago, Ill., Hugh. Lynch, Jr., Washington, D. C., John E. MacLeish, Chicago, Ill., appeared, Cravath, Swaine & Moore, New York City, and MacLeish, Spray, Price & Underwood, Chicago, Ill., of counsel, for U. S. Gypsum Co.

Albert E. Hallett, Chicago, Ill., for Celotex Corp.

Before STONE, United States Circuit Judge, and COLE and WORLEY, Judges of the United States Court of Customs and Patent Appeals, sitting as District Judges.

STONE, Circuit Judge.

The United States brought an Anti-Trust action (Civil No. 8017) against United States Gypsum Company, et al., which were engaged in the mining of gypsum rocks and in the manufacture and sale of gypsum products. The complaint charged that a controlling unlawful combination was effectuated by means of substantially uniform patent license agreements between USG and the other manufacturing defendants as licensees. At the close of evidence for the United States, the statutory Court of three judges sustained a motion to dismiss the complaint under Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. upon the ground that on the facts and the law the Government had shown no right to relief, United States v. United States Gypsum Co., D.C., 67 F.Supp. 397.

The Government appealed and the Supreme Court reversed and remanded "for further proceedings in conformity with this opinion." 333 U.S. 364, 402, 68 S.Ct. 525, 545, 92 L.Ed. 746. This decision was on March 8, 1948 with rehearing denied on April 5, 1948, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147.

After remand, the Government moved for a summary judgment, which was entered on November 7, 1949 (one Judge dissenting). As of that date, this Court entered a decree intended to cover the matters involved. Both sides appealed. The Government contended that the decree was not adequate to cure the ill effects of the illegal conduct of the defendants. The defendants contended that the summary judgment had denied their right to present direct evidence which would have established the lawfulness of their activities.

May 29, 1950, the Supreme Court dismissed the appeal of the defendants, 339 U.S. 959, 70 S.Ct. 995, 94 L.Ed. 1370, in a memorandum, 339 U.S. 960, 70 S.Ct. 996, 94 L.Ed. 1370, wherein it affirmed Article III of the November 7, 1949, decree and stating:

"* * * Article III of the decree of the District Court of November 7, 1949, reading as follows: 'The defendant companies have acted in concert in restraint of trade and commerce among the several states in the eastern territory of the United States to fix, maintain and control the prices of gypsum board and have monopolized trade and commerce in the gypsum board industry in violation of sections 1 and

2 of the Sherman Anti-trust Act [15 U.S.C.A. §§ 1, 2],' is affirmed. The corporate defendants and Samuel M. Gloyd, doing business as Texas Cement Plaster Company, are enjoined, pending further order of this Court, from (1) enforcing in any manner whatsoever the provisions of their current license agreements fixing, maintaining, or stabilizing prices of gypsum board or the terms and conditions of sale thereof, and (2) from entering into or performing any agreement or understanding in restraint of trade and commerce in gypsum board among the several states in the eastern territory of the United States by license agreements to fix, maintain, or stabilize prices of gypsum board or by license or other concerted action arranging the terms and conditions of sale thereof."

On November 27, 1950, the Supreme Court decided, 340 U.S. 76, 71 S.Ct. 160, 173, 95 L.Ed. 89, that the decree of November 7, 1949 was inadequate. The Court pointed out wherein it found such inadequacies and closed its opinion as follows: " 'With these general suggestions, the details and form of the injunction can be more satisfactorily determined by the District Court.' Its procedure for the settlement of a decree is more flexible than ours." On the same day, the Supreme Court extended its injunction order of May 29, 1950, 339 U.S. 960, 70 S.Ct. 996, to be "continued in effect until the entry of a final decree in the District Court." [1]

On May 15, 1951, this Court modified its earlier decree in accordance with this opinion of the Supreme Court. There was no appeal therefrom. This is the present Final Decree.

In January, February or March, 1953, USG filed separate similar actions against four of the other corporate defendants in the Anti-Trust action.

These suits were: against the National Gypsum Company, in the Northern District of Iowa; against Certain-Teed Products Corporation, in the same District; against Newark Plaster Company, in the District of New Jersey; and against the Ebsary Gypsum Company, in the Southern District of New York. Each of these suits was based on alternative claims for royalties or for the reasonable value of the use of certain of its patents or for damages because of infringement. The time period covered by each of these four suits was, roughly, from the first opinion by the Supreme Court ([333 U.S. 364, 68 S.Ct. 525] March 8, 1948), to the date of the Final Decree (May 15, 1951), and, as to Newark and Ebsary, up to the filing of the complaint against each of them.

The Petitioner in each of the four suits here has filed, in the Anti-Trust case, its separate petition to enjoin the USG suit against it and for associated relief. Very broadly stated, these petitions are based on claimed protection of the Final Decree in the Anti-Trust case, on misuse of patents, and on prevention of a multiplicity of actions. Stay orders have been entered in the two Iowa District cases to await action here. Also, the United States has filed a petition to enjoin USG from asserting any claim or suit "in whole or in part on any of the license agreements adjudged illegal, null and void by the final decree of this Court entered on May 15, 1951, or on any provision thereof." As to any claims based on such license agreements, the United States alleges that such "are barred by, and constitute an attempt to defeat, said decree." As to any "alternative claims" set forth in such four suits, the United States "takes no position" as to whether or not they are barred by the Final Decree.

Both by briefs and oral arguments, the issues have been excellently presented by very able counsel for all of the parties.

[1.] This extension order appears in the mandate issued to this Court on the remand from the opinion in 340 U.S., 71 S. Ct.

A plan as a guide to our sequence in considering the issues before us is under four general headings as follows:

I—Jurisdiction

II—Scope of Article IV of the Decree

III—Modification of the Decree

IV—Misuse and Purge

This opinion will follow that arrangement.

## I—JURISDICTION

■ Jurisdiction of a Court to act upon matters presented to it is purely a matter of power to act. Having such power, whether a Court should exercise it may or may not become a matter of discretion depending upon whether, under all the circumstances of the situation before the Court, the Court has a duty or has a choice.

Petitioners claim jurisdiction here on four grounds: (a) to compel obedience to the Decree, (b) to implement the Decree in order to effectuate its "basic" purposes, (c) to exercise a "paramount" jurisdiction under express reservations in Article X thereof, and (d), under broad powers of a court of equity, as the most appropriate forum to prevent possible misconstruction of the Decree, in a multiplicity of actions, by Courts unfamiliar with this Anti-Trust case litigation.

Besides countering each of these grounds, USG contends (a) that only the Government (being the sole original complainant) can move to construe or enforce the Decree, and (b) that the Government can participate in the four suits as a permitted intervener or as an *amicus curiæ*.

Such being the contentions as to this issue, it seems logical to consider first the contentions of USG. The main reliance of USG is Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co., 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155. Petitioners distinguish this case on the grounds that the Buckeye was not a party to that Anti-Trust suit (while Petitioners are defend-

ants in such action here); and that Article X of this decree expressly reserves jurisdiction to enable "any of the parties to this decree * * * to apply to this Court, at any time for such orders" etc. They cite Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 665, 61 S.Ct. 666, 85 L.Ed. 975; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L. Ed. 1230 and Terminal Railroad Association v. United States, 266 U.S. 17, 45 S. Ct. 5, 69 L.Ed. 150 to support their contention that parties to an anti-trust case may act to protect their interest based on the Anti-Trust Decree.

■■ Speaking generally and without regard to any special considerations applicable to anti-trust suits, it is correct to say that a court of equity has power to enforce its decrees and that such power includes implementation of the basic purposes thereof in so far as such appears from the language or from the clear intendment thereof. These rules apply to civil anti-trust suits brought by the Government with the important qualification or limitation as to the parties who may take advantage of them. This difference arises from the purposes of such suits. The purposes of such an action are to destroy an economic situation which is resulting from a conspiracy or monopoly in restraint of interstate commerce to the harm of the public.

To represent and protect this public interest is made the duty of the Attorney-General, 15 U.S.C.A. § 4 and related sections of the Act.[2] USG relies upon the Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co., 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155, which dismissed certain petitions in intervention seeking relief in an anti-trust suit brought by the Government and in which a decree for dissolution had been entered some seven years before the intervening petitions were filed, as establishing the doctrine that only the Attorney-General can seek to enforce, construe or modify a decree re-

---

2. This duty is different and broader than the right given individuals to recover separate damages under 15 U.S.C.A. § 15.

Compare United States v. Borden Company, 347 U.S. 514, 74 S.Ct. 703.

quiring dissolution under the Act. There are expressions in the Buckeye case which tend to support such a view.[3] However, this statement is immediately followed by another which clearly implies that the situation might have been different had interveners been parties to the Anti-Trust suit.[4]

■ Parties to an original anti-trust suit have a status therein which often does not apply to outsiders. This arises from the practical effects of the decree upon the legal rights of the parties. Such a decree is based upon a determination that the Act has been violated by an existing economic situation. Necessarily, the relief is such alteration of that situation as will do away with all unlawful features and potentialities. Unavoidably, such legal surgical operations involve and change the inter-relationship of the defendants, whose only reason for being made parties defendant was that they participated in the violation of the Act. Such decrees are intensely practical. Often, in this readjusting process, a decree provides not only for duties but also for rights *inter se* the parties. Where such rights are given, they carry to the recipient party the right to urge compliance, within the limits of the decree.

This is the rule applied in Terminal Railroad Association of St. Louis v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150. This was an action for contempt instituted by the "west side lines" against the "east side lines" based upon the contention that the latter had violated an anti-trust case decree to the damage of rights alleged accorded the "west side lines" under that decree. In that opinion, 266 U.S. at page 27, 45 S.Ct. at page 7, the Court stated:

"In these proceedings, the United States did not join in the complaint or participate in the hearing in the District Court, but has since appeared and is aligned with the appellees. The proceedings were instituted by the west side lines, not to vindicate the authority of the court, but to enforce rights claimed by them under the original decree. The controversy is between them and the east side lines as to whether the former or the latter shall bear transfer charges on west bound through freight."

Also, the Court, 266 U.S. at page 29, 45 S.Ct. at page 8, stated:

"* * * The question whether the east side lines are bound to pay transfer charges on westbound through freight depends upon the proper construction and application of the original decree."

There is another case which is important. In an anti-trust suit by the United States v. Columbia Gas and Electric Co. et al., a consent decree was entered. The closing paragraph of the decree provided that Panhandle Eastern Pipe Line Co. (not a party in the action) " 'upon proper application, may become a party hereto for the limited purpose of enforcing the rights conferred by Section IV hereof.' " Thereafter, Panhandle sought to do this by applying for leave to intervene, which was denied by the District Court. The appeal of Panhandle is Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 503, 61 S.Ct. 666, 85 L.Ed. 975.

In discussing the case, the Supreme Court stated, 312 U.S. at 504, 61 S.Ct. at page 667, that the "issues here revolve around the scope of those provisions of

---

3. At page 49 of 269 U.S., at page 63 of 46 S.Ct. of that opinion the Court stated:

"* * * The United States which must alone speak for the public interest, does not appear with them [the interveners] on this appeal. They have therefore no *locus standi*. United States v. Northern Securities Co., C.C., 128 F. 808."

4. At page 49 of 269 U.S., at page 63 of 46 S.Ct. appears:

"Underneath all these reasons for dismissing the appeal, is the fundamental objection that these coal companies presented no case upon their petition justifying their intervention. They were not parties to the original suit."

the decree." Among the arguments pressed was a challenge to the jurisdiction over the appeal or, "in the alternative, insisting on the propriety of the action of the district court." 312 U.S. at page 505, 61 S.Ct. at page 667. It was argued that "the Attorney General is the guardian of the public interest in enforcing the antitrust laws * * * [and that] injection of new issues ought not to be allowed to delay disposition of the main litigation * * *." 312 U.S. at page 505, 61 S.Ct. at page 667. The Court stated, 312 U.S. at page 506, 61 S.Ct. at page 667:

"All of these arguments misconceive the basis of the right now asserted. Its foundation is the consent decree. We are not here dealing with a conventional form of intervention, whereby an appeal is made to the court's good sense to allow persons having a common interest with the formal parties to enforce the common interest with their individual emphasis. Plainly enough, the circumstances under which interested outsiders should be allowed to become participants in a litigation is, barring very special circumstances, a matter for the *nisi prius* court. But where the enforcement of a public law also demands distinct safeguarding of private interests by giving them a formal status in the decree, the power to enforce rights thus sanctioned is not left to the public authorities nor put in the keeping of the district court's discretion.

"That is the present case. Panhandle's right to economic independence was at the heart of the controversy. An important aspect of that independence was the extension of its operations to permit sales in Detroit. The assurance of this extension was deemed so vital that it was safeguarded by explicit provisions in the decree."

Further, the Court stated, 312 U.S. at page 508, 61 S.Ct. at page 668:

"We are not concerned with the substantiality of this claim. The sole question before us is whether there was standing to make the claim before the district court. We hold there was such standing. To enforce the rights conferred by Section IV was the purpose of the motion. * * * Nor can the enforcement of this protection be deemed remotely in conflict with the public duties of the Attorney General, nor to bring in digressive issues, nor to impeach the existing decree. It is a vindication of the decree."

In the concluding paragraph, the Court states, 312 U.S. at page 509, 61 S.Ct. at page 669:

"In a memorandum filed by the Attorney General we are advised that on January 18, 1941, the District Court filed an opinion [36 F. Supp. 488] approving the plan for modifying the original decree subject to some suggestions by the Government. This, we are told, 'is believed to satisfy the public interest,' and so the Government desires to sustain the action of the court below without further litigation. We recognize the duty of expeditious enforcement of the antitrust laws. But expedition cannot be had at the sacrifice of rights which the original decree itself established. We assume that the district court will adjust the right which belongs to Panhandle with full regard to that public interest which underlay the original suit."

We think that these three cases announce the following rules of law applicable to the situation here: the Attorney-General is the representative of the "public interest" in anti-trust cases brought by the Government; but that where a dissolution decree by specific statement or by fair implication therein accords rights to parties thereto, they have a standing, in the main suit, to enforce such rights in a manner consonant

with the underlying purposes of the decree.[5]

In this Final Decree, there was (Article X) an expressly reserved jurisdiction "for the purpose of enabling any of the parties to this decree, or any other person, firm or corporation that may hereafter become bound thereby in whole or in part, to apply to this Court at any time for such orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this decree, and (2) for the enforcement of compliance therewith."

Such reservation is sufficient to sustain jurisdiction.

■ For the reasons that the Petitioners here are parties to the original Anti-Trust suit presenting claims to rights under the Final Decree; and that Article X of that Decree expressly reserves jurisdiction, we hold that jurisdiction to entertain these petitions exists. In so holding, we apply the language in the Missouri-Kansas Pipe Line Co. case, supra, 312 U.S. at page 508, 61 S.Ct. at page 668, that "We are not concerned with the substantiality of this claim. The sole question before us is whether there was standing to make the claim before the district court. We hold there was such standing." Such "substantiality" depends upon what we will call "The Merits" of these controversies —to be considered later in this opinion.

Next, passing to the four grounds alleged by Petitioners to sustain jurisdiction—all of which are challeged by USG.

■■ The inherent power of a court of equity to compel obedience to its decrees is conceded by USG. It contends that its suits do not violate the Decree, hence this doctrine is inapplicable here. Where it is seriously contended, as here, that these suits do violate the Decree, obviously, this Court has power—jurisdiction—to determine whether such violation exists; and, if it does exist, how it may be cured.

As to the existence of power—jurisdiction—we think it is not controlling that Petitioners might urge the Decree as a defense in the USG suits. That question is not one of the existence of jurisdiction in this Court but rather one of whether this Court, in its discretion, should exercise such jurisdiction instead of leaving such issues to be determined in the USG suits.

As to the ground for jurisdiction based upon "implementation" of the Decree to effectuate its basic purposes, we think the reasoning in Local Loan case, supra, 292 U.S. at page 239, 54 S.Ct. at pages 696, 697, is merely one of the methods of seeking relief in the original action. There it was by an ancillary bill and here by petitions. Here, as there, the jurisdiction "to secure or preserve the fruits and advantages of a judgment or decree rendered therein" is a basis urged here for our jurisdiction. Here, Petitioners urge that Article IV of the Decree established a "status" which is endangered by the USG suits. We think this issue is within the jurisdiction of this Court. As to the nature and limits of implementation, see Hughes v. United States, 342 U.S. 353, 356–357, 72 S.Ct. 306, 96 L.Ed. 394.

■ As to modification of the Decree as a Jurisdictional matter, Article X expressly reserves that power. Whether or to what extent the Decree should be modified are matters within the proper exercise of that power. If this power should be exercised, we think we have

---

5. We have confined our discussion to parties to the original Anti-Trust suits. However, there are other cases where persons not parties but directly affected by the decree in such cases have been allowed, in connection with such suits, to intervene or to defend to test their rights. Examples are Hughes v. United States, 342 U.S. 353, 72 S.Ct. 306, 96 L. Ed. 394; United States v. Paramount Pictures, 334 U.S. 131, 176–178, 68 S.Ct. 915, 92 L.Ed. 1260; United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; United States v. California Cooperative Canneries, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838; Continental Ins. Co. v. United States, 259 U.S. 156, 42 S.Ct. 540, 66 L.Ed. 871.

power, as admonished by the Supreme Court in this case, 340 U.S. at pages 88-89, 71 S.Ct. at page 169, to make any modifications which will, "so far as practicable, cure the ill effects of the illegal conduct, \* \* \*." At the same time, we cannot enlarge the Decree beyond the limits necessary to perfect its effectuation. United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999. Also United States v. International Harvester Co., 274 U.S. 693, 702, 47 S.Ct. 748, 751, 71 L.Ed. 1302, where the Court stated that a supplemental complaint by the Government to broaden the original decree must be denied because "This is entirely inconsistent with *the purpose of the consent decree,* both as appears from its terms and as it was apparently construed by the District Court itself." (Italics added.) Also, see Hughes v. United States, 342 U.S. 353, 356-357, 72 S.Ct. 306, 96 L.Ed. 394.

 As to jurisdiction based on possible misconstruction of the Decree in a multiplicity of Courts. It seems to us that this ground is really that of a multiplicity of actions. The matter of possible misconstruction of the Decree is rather a *reason* for taking jurisdiction where there is a claimed multiplicity of actions each involving the meaning and application of the Decree. We think there is a proper and clear multiplicity of actions, to wit, the four present suits by USG and the claims against Celotex and Kaiser. Multiplicity of actions prevention is a long established basis of equity jurisdiction. We think such jurisdiction is present here. Our conception of this character of jurisdiction is that its exercise is discretionary instead of compulsory. The extent of such exercise should depend upon our solution of the issues herein as to the merits.

In this part of our opinion we are not determining anything as to the merits but only broadly that Petitioners have the right to proceed.

Our next task is to determine the merits of the several issues which Petitioners claim entitle them to relief. In doing this, we do not leave behind us all questions of jurisdiction. The broad issues are: (a) the Scope of Article IV of the Decree, (b) the Modification of the Decree, and (c) Misuse of Patents, with the related matter of Purge. As to each of these issues there enters a matter of jurisdiction—not as to *general* jurisdiction to entertain Petitioners' actions here but as to the legal limits within which we may act in considering and determining the particular issue. An illustration of this kind of jurisdiction is the general doctrine that a decree cannot be enlarged beyond the effectuation of the purposes thereof.

## II—SCOPE OF ARTICLE IV

Petitioners contend: (1) that Article IV of the Decree "in terms and by fair intendment" bars these suits by USG; (2) that, even if Article IV "in its present form" is not a bar, yet it should be so *implemented* as "necessary to achieve the basic purpose" of the Decree; and (3) that if such remedy is deemed not within the Decree, "as it presently stands," the Decree should be so modified, because the need for such relief has only recently become necessary in order to achieve its basic purpose. The last of these three contentions will be hereinafter treated under the next heading of this opinion—that of "III—Modification."

The scope of Article IV should be determined in the light of the issues in the Anti-Trust case, of the entire Final Decree, of the proceedings in this Court in connection with the two decrees (November 7, 1949 and May 15, 1951), and the here pertinent statements in the opinions of the Supreme Court in this litigation. To discuss each of these matters adequately is an unnecessarily large undertaking for the purposes of this opinion. We shall attempt only a sufficient outline of the essential high points.

*The Issues.* The Anti-Trust suit was to enjoin violations of Sections 1, 2 and 3 of the Act. These violations were charged as being carried out by means of patent license agreements granted by USG to the other defendants (manufacturers of gypsum board). The opinion

of Chief Judge Stephens very finely and completely narrates the facts and issues on the trial which resulted in the first appeal, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. We refer to his opinion, United States v. United States Gypsum Co., D.C., 67 F.Supp. 397, for a more detailed statement of the issues.

*The Final Decree.* The pattern of the Final Decree of ten Articles is as follows. Article I is the jurisdictional declaration; Article II is the definition of terms used in the Decree, these include "Patents" [6] and "Patent Licenses";[7] Article III declares the defendants have acted in concert to violate Sections 1 and 2 of the Act; Article IV is that "Each of the license agreements listed in Article II hereof is adjudged unlawful under the anti-trust laws of the United States and illegal, null and void"; Article V contains the injunction provisions;[8] Article VI covers non-discriminatory compulsory license agreements from USG to applicants therefor, subject to approval of the District Court; Articles VII and IX are not material to us here; Article VIII provides for supervision by the Department of Justice to secure compliance with the Decree; Article X is the reservation of jurisdiction for the purposes of construction of, carrying out of, or enforcement of the Decree.

A condensation of the method or plan of the Decree to remedy the unlawful situation may be stated as follows: by annulling the existing named license agreements; by injunction against acts which would tend to defeat the Decree; by use of new compulsory court supervised license agreements; by Department of Justice supervisory inspections; and by retention of broad jurisdiction to protect and effectuate the purposes of the Decree.

*Proceedings in this Court.* After rehearing was denied, April 5, 1948, 333 U.S. 869, 68 S.Ct. 788, this Court held a conference of counsel which resulted ultimately in a motion by the Government for summary judgment, it being claimed that there was no genuine fact issue remaining to be determined. Defendants filed offer of proof as to fact matters they deemed yet in issue. These two occurrences were in June 1948. Beginning in June 1948 and extending to June 14, 1949, numerous briefs and memoranda were filed by the various parties in connection with the motion for summary judgment, the offer of proofs, suggested findings of fact, and form and contents

---

6. "Patents" is defined as including all patents and applications therefor (covering gypsum board, its processes and methods of manufacture or use thereof) issued to, applied for or acquired "within a period of five (5) years from the date of this decree", as well as patents issued upon any of said applications, continuations, etc., of any such patents or applications.

7. "Patent Licenses" mean the patent license agreements in effect between USG and each of the other defendants "at the time the complaint herein was filed and described in said complaint as follows: [here follows listing of eighteen such agreements] and any supplement or amendment" thereto.

8. These provisions are "from entering into or performing any agreement or understanding among the defendant companies or other manufacturers of gypsum products to fix, maintain or stabilize, by patent license agreements or other acts or course of action, the prices, or the terms or conditions of sale, of gypsum products sold or offered for sale to other persons, in or affecting interstate commerce; and from engaging in, pursuant to such an agreement or understanding, any of the following acts or practices:

"(1) agreeing upon any basis for the selection or classification of purchasers of gypsum products;

"(2) refraining from selling gypsum products to any purchaser or any class of purchasers;

"(3) agreeing upon any plan of selling or quoting gypsum products at prices calculated or determined pursuant to a delivered price plan which results in identical prices or price quotations at given points of sales or quotations by defendants using such plan;

"(4) policing, investigating, checking or inquiring into the prices, quantities, terms or conditions of any offer to sell or sale of gypsum products."

of decree to be entered. June 14, 1949 this Court held an extended hearing upon all of these matters. At the hearing, a majority of this Court made clear their intention to sustain the motion for summary judgment; and counsel for all parties were given time to file suggestions and memoranda as to form of decree and other pertinent matters. Such suggestions and memoranda were filed up to August 12, 1949. Without further hearing, this Court entered its decree of November 7, 1949. It is this decree from which the Government and the defendants appealed (Defendants' appeal 339 U.S. 959, 70 S.Ct. 995 and 339 U.S. 960, 70 S.Ct. 996, Government appeal 340 U. S. 76, 71 S.Ct. 160).

We have gone through the transcript of the hearings in this Court (June 14, 1949), the written or printed suggestions and memoranda of the parties filed before, in connection with and after that hearing. Much of these matters and the hearing had to do (inter alia) with the various suggestions as to the form of decree to be entered, including the scope and purposes of what later became, in substance, Articles III, IV and VI of that decree. Practically all of the matters were concerned with prevention of violation in the future, that is, after the effective date of the decree to be entered. However, USG was much concerned with avoiding any provision in the decree declaring the licenses illegal, null and void in their entirety. It was in this connection that it voiced its apprehensions as to the period involved here. Since our concern here is with what took place after the first opinion of the Supreme Court and before entry of the Final Decree (May 15, 1951), our search was primarily aimed at anything in this presentation in connection with the November 7, 1949 decree which might throw particular light upon the period of our concern. Some little discussion occurred, at the hearing, over the terms and conditions of compulsory licenses.

At this point, it is convenient for us to narrow our consideration of the causes of action alleged in the petitions filed by USG in the various other District Courts. These petitions contain five Counts each in the actions against National and against Certain-Teed, and six Counts in those against Ebsary and Newark.[9] The first two Counts of all four petitions are directly based on the license agreements set forth in Article II of the decree of November 7, 1949. Article IV of that decree nullified completely the license agreements listed in Article II. This nullification did not create a status. It simply declared a status which had existed since the granting of the license patents. This Article was made effective *pendente lite* by the Supreme Court in connection with disposition of the appeal of the defendants in the Anti-Trust case, May 29, 1950, 339 U.S. 960, 70 S.Ct. 996, by enjoining any continued performance thereunder. Article IV passed into the Final Decree unchanged. The effect of Article IV was to nullify completely these license agreements. In this situation, we determine that these two Counts in all of these suits should be enjoined from further prosecution because they clearly violate the express provisions of Article IV. We are not impressed by the contention of USG that these two Counts are necessary or useful to meet possible factual situations which might arise in the trials of these suits. Those Counts state definitely grounds for claimed relief and must be so regarded. This determination allows us hereinafter to limit and concentrate attention upon the other Counts of each petition.

We turn now to matters in connection with the formation of the 1949 decree which throw light upon the period now involved. In this connection, it should be in mind that the four Petitioners here

9. In the suit against Ebsary and in that against Newark the additional Count (Count 6) is for alleged infringement of a patent not covered in any of the license agreements listed in Article II of the Decree. We will later herein determine as to these Counts 6.

had ceased paying royalties (under the license agreements) shortly after the first opinion of the Supreme Court, 333 U.S. 364, 68 S.Ct. 525, March 8, 1948.

During the discussion at the hearing on June 14, 1949, Mr. Miller, counsel for Certain-Teed stated:

"* * * Mr. Dallstream, who will follow me, will present to Your Honors the exact changes we desire to make in both decrees [presented by the Government and by USG] which would give us the decree we would be satisfied with and which we hope that Your Honors will adopt."

Thereafter, Mr. Dallstream stated:

"At IV, which United States Gypsum has left out altogether, and has gone back over to page 7 and shown it lined up with VII of the Government, we would like to suggest that in lieu of either, the Article VII of the Government and Article IV of U. S. Gypsum, that a new Article IV reading in exactly the language of the Masonite case [United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461] be entered, which would read as follows:

"'That each of the license agreements listed in Article II hereof is adjudged unlawful under the antitrust laws of the United States and is illegal, null, and void.'

"Chief Judge Stephens: You suggest that in place of Article VII of the Government?

"Mr. Dallstream: Of the Government and Article IV of United States Gypsum.

"Chief Judge Stephens: Yes.

"Mr. Dallstream: I agree with Mr. Finck that we cannot dodge the fact that whatever interpretation should be put on the Supreme Court's decision, the majority of this court have decided that the mere plurality of licenses, accompanied by the other features that existed in this case, made those agreements illegal and that, being illegal, they are unenforceable and are null and void.

"Now, we are faced with the dilemma: What are we going to do about it: We have got to have some new ones if we are going to be fair to the industry, to these licensees, the public, and to all concerned; and so, some provision must be made, and we think V and VI take care of that, and if we declare them null and void for these reasons, which have been recited in the previous paragraph of this decree, that we have taken care of the situation.

"In order that United States Gypsum will have no misunderstanding of my position, I want them to know that my suggestion is in no sense based on any hope or desire on my part to get out of any license fees during any interim period, and if we can agree upon an appropriate license agreement, as far as my client is concerned, we are willing to let the royalty rate, whatever it is, agreed upon apply back to the time when we ceased paying royalties. I just want to make it clear to all that we are not attempting by this declaration of illegality of them to find some way of avoiding the license fees which during this none of us have paid." (Transcript, pp. 8220–8221).

In a Reply Memorandum filed by USG (July 23, 1949), are the following statements:

"The defendant licensees can have no purpose in making the suggestion that each patent license be adjudged illegal except to obtain some advantage with respect to the use of the patents. They apparently believe it will relieve them from accounting for anything done either before or after the Supreme Court's decision." (P. 6)

"They have no right of any kind to Gypsum's patents in the future any more than if their licenses had

expired without this litigation. With the cancellation of their present licenses they should only be placed in *statu quo* to the extent that any licensee desires to continue the use of any of Gypsum's patents under which it is presently licensed." (P. 8)

"In the first place, Newark seeks a provision that each of the license agreements be adjudged unlawful under the anti-trust laws and illegal, null and void, which not only goes beyond the scope of the determination by this court upon the motion for summary judgment but has for its purpose an attempt to be relieved from accounting, as stated before in this memorandum." (P. 9)

"National like Newark, is one of those companies which seeks to have the entire license contract declared illegal, apparently believing it will relieve them from accounting with respect to anything done before or after the decision of the Supreme Court." (P. 15)

It is clear from the foregoing quotations that the situation as to our period was brought up at the hearing and in the USG Memorandum in connection with the discussion as to the scope and possible effect of what later became Article IV, which *struck down the licenses in toto*. USG thus expressed its apprehension that the licensees had in mind some purpose of avoiding an accounting for use of its patents during our period. In so far as Certain-Teed and Celotex were concerned, any ground for this apprehension was expressly disavowed by Mr. Dallstream. National, Newark and Ebsary made no mention of the matter. No party sought to have it, specifically and separately, included in the decree of November 7, 1949.

It is important to emphasize the matter, in connection with which, these apprehensions of USG were expressed. The main contention between USG (on one side) and the Government and the other defendants (on the other side) was whether the decree should be confined, as

to declaration of illegality, to the price fixing provision in the license agreements. Strenuously, USG contended for such limitation. This appears not only in its arguments and briefs in connection with the June 14, 1949 hearing but in its original suggestions as to prospective Articles III, IV, V and VI. As a companion and resultant position, USG urged that, while the existing agreements should be *cancelled, as of the date of the decree*, only the minimum price provision should be declared illegal. The result of and purpose of these contentions would be to leave the agreements valid—therefore enforceable —until entry of the decree, except for the minimum price provision. It was in this setting and in relation to these contentions, that USG expressed its apprehensions above set out. The contest was whether the agreements were illegal only as to minimum price provisions or *in toto*. The decree of November 7, 1949 declared the agreements "illegal, null and void" in entirety.

The same reasoning as to Article IV would apply to the Final Decree unless the situation is affected by the later Supreme Court decisions herein or by what occurred in this Court on the last remand (in connection with the entry of the Final Decree here). We have examined the meager original file (in the Clerk's Office) as to what took place in this Court after the remand on the 340 U.S., 71 S.Ct. appeal. We find nothing except counter suggested forms of decree filed by the Government and by USG. Neither contains anything expressly bearing upon our problems relating to this period covered by these USG suits. Apparently, this Court took these submitted forms and shaped its Final Decree of May 15, 1951 in endeavoring to follow the directions of the Supreme Court as announced in 340 U.S. 76, 71 S.Ct. 160.

*Supreme Court Opinions.* Concisely summarized, the three opinions of the Supreme Court made the following determinations which need consideration in connection with point II of this opinion. In 333 U.S. 364, 68 S.Ct. 525, 543,

the Court decided (1) that the defendants had "acted in concert"—conspired —to control prices and to monopolize the gypsum industry; (2) that the instrumentalities created and employed to effectuate these purposes were license agreements covering patents owned or controlled by USG; and (3) that such agreements covered control (a) of prices of patented gypsum board (expanded in 340 U.S. 76, 71 S.Ct. 160, to cover gypsum products), (b) control or affection of prices of unpatented gypsum products, and (c) control over terms and conditions of sale and distribution thereof. In the course of this opinion, the Court announced that the motive—good faith in reliance on the belief that such agreements were lawful under United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362—did not bar such patent exploitation as here found. The case was remanded for further proceedings.

When this Court granted a summary judgment on this remand and entered its decree, both the Government and the defendants appealed. The Government objected to the decree as being too narrow. The defendants contended their proffer of proof revealed issues of fact which this Court should have determined instead of granting the summary judgment. The Supreme Court affirmed Article III of that decree to the effect that sections 1 and 2 of the Act had been violated; entered an injunction against "enforcing in any manner whatsoever" the license agreements, 339 U.S. 960, 70 S. Ct. 996; and dismissed the appeal of the defendants, 339 U.S. 959, 70 S.Ct. 995.

On the appeal by the Government, that Court altered and broadened some of the provisions of our decree and remanded the case "for further proceedings in conformity with this opinion." 340 U.S. 76, 95, 71 S.Ct. 160, 173. In that opinion there was no direct reference to a situation such as is now presented to us arising from these USG suits; Article IV was not changed.

In that opinion the Court stated, 340 U.S. at pages 88–90, 71 S.Ct. at page 169:

"A trial court upon a finding of a conspiracy in restraint of trade and a monopoly has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance. Such action is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal. Acts entirely proper when viewed alone may be prohibited. The conspirators should, so far as practicable, be denied future benefits from their forbidden conduct.

"The determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court. Its opportunity to know the record and to appraise the need for prohibitions or affirmative actions normally exceeds that of any reviewing court. This has been repeatedly recognized by us. Notwithstanding our adherence to trial court responsibility in the molding of a decree as the wisest practice and the most productive of good results, we have never treated that power as one of discretion, subject only to reversal for gross abuse. Rather we have felt an obligation to intervene in this most significant phase of the case when we concluded there were inappropriate provisions in the decree. In resolving doubts as to the desirability of including provisions designed to restore future freedom of trade, courts should give weight to the fact of conviction as well as the circumstances under which the illegal acts occur. Acts in disregard of law call for repression by sterner measures than where the steps could reasonably have been thought permissible. We turn then to the Government's proposals for modification of the decree on the assumption that only a violation through concerted

industry license agreements has been proven, but recognizing, as is conceded by defendants, that relief, to be effective, must go beyond the narrow limits of the proven violation."

Evaluating all of the foregoing matters and those now before us, we have some doubt as to whether Article IV is firm ground and it seems wiser to resolve those doubts against the contention that this Article, by fair implication, covers our situation. We are less disturbed in so resolving this doubt by the consideration that we can reach the same ultimate result over ground that we deem firm.

*Newark and Ebsary.* In Footnote 9 hereinbefore, we have referred to an additional Count (VI) in the USG petitions against those companies. This seems an appropriate place to determine that matter and, also, of another feature in those two petitions. The first matter is whether the patent covered in those Counts is included in list of patents defined in Article II of the Decree. The second is whether those two companies are liable for infringement of that, as well as other patents set forth in Counts I to V inclusive.

■ As to the first of these two matters. Application for this patent was filed by Roos on August 15, 1929 and later assigned to USG, to which the patent was issued on June 16, 1936. This patent related to the use of dextrinized starch in gypsum board core composition and method of manufacturing same. USG contends that this patent was not included in any of the license agreements with either of these companies. This, the companies deny. This patent (No. 2,044,401) was obviously an improvement patent. As such, we think it was included as paragraph 18 of the licenses to each of these companies (See Transcript in the Supreme Court, October Term, 1947, No. 13, pp. 4416 and 4488). Also, Article II of this Final Decree defines "Patents" as meaning "United States Letters Patent and applications [therefor] * * * relating to gypsum board, its processes, methods of manufacture or use, now [May 15, 1951, the date of the Decree] owned or controlled by" USG. Also, the broadening of Article II, § 3 by the Supreme Court, 340 U. S. at page 90, 71 S.Ct. at page 170, seems directly to include "improvement" patent subject matter.

As to the second matter. Seasonably after entry of the Final Decree, National and Certain-Teed applied for and received licenses thereunder. Newark and Ebsary have never applied therefor. In the USG petitions against Newark and against Ebsary, it seeks recovery (Counts I–II) for license royalties on patents covered by the old licenses—that recovery included only the period ending with the Final Decree. Each of the succeeding Counts sought recovery "to the date of filing this complaint."

We have already disposed of all recovery up to May 15, 1951 (the Final Decree). Our immediate concern is with the period between this entry of the Decree and the filing of these USG actions, early in 1953. Neither Newark nor Ebsary have filed answer in these USG suits. We were informed in this presentation, that such answers would include a denial of use of these patents during this later period. Such defenses would obviously pose the direct issue of infringement *vel non* since this Decree. We think trial of that issue before the New York and New Jersey District Courts should not be interfered with here. There is no room, in this situation, for application of the multiplicity of actions rule, since each of these two cases must depend, as to this issue, upon its own set of facts. Nor do such limited issues affect the Final Decree here in any respect.

## III—MODIFICATION

It seems to us that there is some intermixing of the positions (as argued by both sides) of the legal principles of "implementation" of what is claimed to be required by the Decree (as it presently is) with the right and duty as to modification of the present Decree. Although

the same practical effect might result from either "implementation" or modification, yet the legal considerations which control and limit the use of each differ from those applicable to the other.

 We think this divergence lies in the different purposes to be served based upon construction of different phases of a decree. As to implementation, the search is for the specific provisions or for the revealed broad purposes and intendments of a decree. If such search clearly shows such provisions or such intendment, implementation may—possibly must—be employed. If such does not appear, then resort may be had to expressed or implied powers to modify. The bases and the limits of the power and as to the duty to modify (if power exists) depend upon some considerations which differ from those governing implementation. We think the difference between the two remedies is exampled in Hughes v. United States, 342 U.S. 353, at pages 356–358, 72 S.Ct. 306, 96 L.Ed. 394. The purpose and the permissible function of an order for modification of an anti-trust decree is to cover something within the broad purposes of the decree but which, for some proper reason, was not included in the existing decree. Almost always, such modifications are concerned with remedies. Usually they concern situations which were either overlooked at the time the decree was entered or which have arisen or developed after the decree.

Here, we have no doubt of our power to make any *proper* modifications. Such power being expressly reserved in Article X of the Decree, we do not have to rely on any general equitable doctrine concerning the powers of a court of equity to protect and enforce its decrees, although these reservations in Article X express the purposes of the general equity doctrine, namely, to construe, carry out and enforce the Decree.

 However, any and all powers (expressed or implied) to modify an equity docree have other limits than "the length of the Chancellor's foot." In this respect, we face the two contentions of USG: (1) that the situation arising from the USG suits was a matter "not then [when the Decree was entered] before the [this] Court or intended to be decided by it" and, therefore not within the Final Decree; and (2) that, if it is within the power of this Court to modify the Decree so as to enjoin its suits, "there is no sound, equitable reason why" it should be thus enlarged. These two USG contentions present the successive questions of power to modify and of discretion in the use of any existing power.

 Generally speaking, there is no doubt that a court of equity has power to modify its decrees so as to make them fully effective. USG argues and cites cases dealing with the limitations on such courts in construing their decrees.[10]

10. Such rules apply to modifications. USG presents them under the headings and citations following.

"(1) Injunctive provisions in a decree must be precise and specific," citing Schine Chain Theatres v. United States, 334 U.S. 110, 126, 68 S.Ct. 947, 92 L.Ed. 1245; Hartford-Empire Co. v. United States, 323 U.S. 386, 410, 65 S.Ct. 373, 89 L.Ed. 322; Swift & Co. v. United States, 196 U.S. 375, 396, 401, 25 S.Ct. 276, 49 L.Ed. 518; Federal Rules of Civil Procedure, Rule 65(d).

"(2) A Decree is limited in its application to the issues actually presented and intended to be adjudicated at the time of entry," citing State of Oklahoma v. State of Texas, 272 U.S. 21, 43, 47 S. Ct. 9, 71 L.Ed. 145; United Shoe Ma-

chinery Co. v. United States, 258 U.S. 451, 460, 42 S.Ct. 363, 66 L.Ed. 708; City of Vicksburg v. Henson, 231 U.S. 259, 268–273, 34 S.Ct. 95, 58 L.Ed. 209.

"(3) Plain and unambiguous terms of a decree may not be extended or contracted by construction," citing Hughes v. United States, 342 U.S. 353, 357, 72 S.Ct. 306, 96 L.Ed. 394; United States v. International Harvester Co., 274 U.S. 693, 702–703, 47 S.Ct. 748, 71 L.Ed. 1302; Terminal Railroad Association of St. Louis v. United States, 266 U.S. 17, 27, 29, 45 S.Ct. 5, 69 L.Ed. 150; Butler v. Denton, 10 Cir., 150 F.2d 687, 689; Union Pacific R. Co. v. Mason City & Ft. Dodge R. Co., 165 F. 844, 852, reversed on other grounds 222 U.S. 237, 32 S.Ct. 86, 56 L.Ed. 180; St. Louis, K. C. & C.

We may accept them as announcing the broad doctrine that a decree may not be enlarged, beyond its intended proper scope, by the medium of modification.

■ In examining this matter of power we must not lose sight of the character of a decree in an anti-trust case. While the general legal rules governing modification of decrees are not exempt from application in such cases, yet the character of such litigation permits—sometimes requires—a degree of elasticity. This feature comes into existence because of the situation that such a decree is designed vitally to change an unlawful, but existing, economic arrangement into such rearrangement as will remove the unlawful features. In framing such a decree, the Court is always necessarily acting with the knowledge that the remedies it then deems sufficient may, from experience thereafter, prove to be incomplete or defective— either because of lack of foresight at the time the decree is formed or because of subsequent happenings or conditions. In short, such a decree can rarely *crystallize* the entire matter. There must be a measure of only *gelling* which is susceptible of modification. Such we think is the teaching of Hughes v. United States, 342 U.S. 353, 357, 72 S.Ct. 306, 96 L.Ed. 394, and of United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999, as well as other cases.

■ Therefore, the question here, as to power, is whether the modifications urged by Petitioners would be an improper enlargement or (as contended by Petitioners) are proper to accomplish the purposes of the Decree. The determinative test is whether or not such modification is reasonably necessary to effectuate the basic purposes of the Decree.

The situation here is that Article IV of this Final Decree did not expressly or impliedly cover the character of suits now brought by USG for infringement or for *indebitatus assumpsit* or for *quantum meruit*. It neither allowed nor forbade such. It simply made no reference to them at all. Some months after the Decree became final, these suits were begun and later brought to our attention for action.

We have, hereinbefore, determined that they involved violations of the Decree as to the first two Counts of each. We now hold that we have jurisdiction to consider whether the Decree should be modified to affect prosecution of the Counts for infringement, for *indebitatus assumpsit* and for *quantum meruit*.

We think these "basic purposes" are to be sought by consideration of the purposes of this Anti-Trust suit, of the opinions of the Supreme Court, the proceedings in this Court as to formation of a decree on the two remands, and upon the terms of the Final Decree.[11]

This was an Anti-Trust action charging violations, by the defendants therein, of Sections 1, 2 and 3 of that Act, 15 U.S.C.A. §§ 1–3. The Supreme Court, in its three opinions, 333 U.S., 68 S.Ct., 339 U.S., 70 S.Ct., and 340 U.S., 71 S.Ct., determined violations of Sections 1 and 2 of the Act through conspiracy to restrain interstate commerce and to monopolize trade therein in the gypsum industry; that these results had been accomplished through concerted action under eighteen similar patent license agreements granted by USG to the other defendants; and that such license agreements were illegal, null and void. To cure this situation, that Court affirmed Article III of the November 7, 1949 decree of this Court and enjoined defendants, pending further order of the Court, "from (1) enforcing in any manner whatsoever the provisions of their current license agreements fixing, maintaining, or stabilizing prices of gypsum

R. Co. v. Wabash R. Co., 8 Cir., 152 F. 849, 852, modified 217 U.S. 247, 30 S.Ct. 510, 54 L.Ed. 752.

11. Under the preceding point (II—Scope of Article IV) of this opinion, we have examined such features of these items applicable to that discussion. We will try to avoid repetition here except as clarity may require.

board or the terms and conditions of sale thereof, and (2) from entering into or performing any agreement or understanding in restraint of trade and commerce in gypsum board among the several states in the eastern territory of the United States by license agreements to fix, maintain, or stabilize prices of gypsum board or by license or other concerted action arranging the terms and conditions of sale thereof." 333 U.S. 960, 70 S.Ct. 996. On November 27, 1950, this injunction order was "continued in effect until the entry of a final decree in the District Court." [12]

In discussing the duty of the trial court in formulating its decree in an anti-trust case where conspiracy in restraint of trade and monopoly have been determined, the Court in 340 U.S. 76, at pages 88–90, 71 S.Ct. 160, at page 169 stated:

"A trial court upon a finding of a conspiracy in restraint of trade and a monopoly has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance. Such action is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal. Acts entirely proper when viewed alone may be prohibited. The conspirators should, so far as practicable, be denied future benefits from their forbidden conduct.

"* * * In resolving doubts as to the desirability of including provisions designed to restore future freedom of trade, courts should give weight to the fact of conviction as well as the circumstances under which the illegal acts occur. Acts in disregard of law call for repression by sterner measures than where the steps could reasonably have been

thought permissible. We turn then to the Government's proposals for modification of the decree on the assumption that only a violation through concerted industry license agreements has been proven, but recognizing, as is conceded by defendants, that *relief, to be effective, must go beyond the narrow limits of the proven violation.*" [Italics added.]

When the case came back here on this last remand, this Court directed (order of January 26, 1951) filing of suggestions, as to form of decree, by plaintiff (Government) and by the defendants.

The violations of the Act are declared in Article III, which is the heart of the Final Decree. The other Articles of the Decree concern the remedies and methods which the Supreme Court and this Court then thought sufficient to cure the unlawful conspiracy and monopoly. Article X performed the function of expressly reserving jurisdiction to take further action if experience thereafter should make such necessary or advisable fully to effectuate these purposes of destroying the monopoly and the conspiracy and denying the fruits thereof.

The practical situation present in this matter of Modification consists mainly of the following:

(1) For some years extending into the trial of this Anti-Trust case, the gypsum industry had been effectively organized so that prices and methods of distribution were controlled through the medium of patent license agreements covering patents and applications therefor owned or controlled by USG. These agreements were between USG and each of the various other defendants. The agreements included both process and machinery covered by the patents.

(2) On the first trial on the merits, June 15, 1946, 67 F.Supp. 397, this Court determined that, under its construction of United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362,

12. This extension order is contained in the original mandate of the Supreme

Court to this Court on the remand under its opinion in 340 U.S., 71 S.Ct.

the separate license agreements were legal, 67 F.Supp. at pages 421–441; and that these agreements were made *bona fides* with no ulterior purpose to violate the Act, 67 F.Supp. at pages 458–484.

(3) On appeal, 333 U.S. 364, 68 S.Ct. 525, the Supreme Court reversed and remanded (March 8, 1948) deciding that the industry-wide license agreements, entered with mutual knowledge of the licensor and of all of the different licensees, under which prices and distribution methods would be controlled, established an unlawful conspiracy and monopoly; and that " * * * regardless of motive, the Sherman Act bars patent exploitation of the kind that was here attempted." 333 U.S. at page 393, 68 S.Ct. at page 541.

(4) The Supreme Court asserted "Of course, this appeal must be considered on a record that assumes the validity of all the patents involved", 333 U.S. at page 388, 68 S.Ct. at page 538. No change was made in that "record" in any subsequent proceedings in this Court.

(5) Almost immediately following this opinion of the Supreme Court, each of these four defendants stopped paying accrued or future royalties or paying otherwise for use of the patents covered by the license agreements. No payments of any kind were made until new compulsory licenses were granted, under the Final Decree, to National and Certain-Teed—Ebsary and Newark did not take out new licenses.

(6) The manufacturing plants of the licensees had been and were organized for use of these patent-covered methods.

(7) In the proceedings in this Court in regard to the formation of the November 7, 1949 decree, issues were presented as to whether the then license agreements should be nullified entirely or in a limited or qualified degree. It was in this connection, that USG argued for a limited or qualified prohibition; and made known its apprehension that an entire nullification might affect its expectation of receiving compensation for the use of its patents by the licensees during our period. This Court framed Article IV nullifying the license agreements entirely, as being illegal.

(8) On the defendants' appeal from that decree, the Supreme Court affirmed Article III and entered its injunction order, 339 U.S. 960, 70 S.Ct. 996. In this injunction the Court expressly forbade defendants from "enforcing in any manner whatsoever" the existing license agreements and this status was thereafter continued up to the Final Decree.

(9) On the Government's appeal, the Supreme Court announced, 340 U.S. at page 87, 71 S.Ct. at page 168, that "good intentions" in the situation of this case was no defense; and that here, 340 U.S. at page 88, 71 S.Ct. at page 169 this Court had the duty of compelling action to "cure the ill effects of the illegal conduct"—such action not being "limited to prohibition of the *proven means* [italics added] by which the evil was accomplished, but may range broadly through practices *connected with* [italics added] acts actually found to be illegal. * * * The conspirators should, so far as practicable, be denied future benefits from their forbidden conduct." The Court stated, 340 U.S. at page 89, 71 S.Ct. at page 169 that "in resolving doubts as to the desirability of including provisions designed to restore future freedom of trade, courts should give weight to the fact of conviction as well as the circumstances under which the illegal acts occur."

Considering this situation, we think the Final Decree should be modified to include a denial of recovery upon the infringement Counts of the USG petitions. Our reasons for this determination are as follows.

The basic thing which made this conspiracy and monopoly possible was the existence of the patent (owned, controlled or applied for) situation. It was the unlawful use by defendants of the monopoly rights, normally inhering in patent grants, which violated the superior rights protected by the Anti-Trust Act. One result of this unlawful use was to create an economic situation where the

conspirators—other than USG—had conditioned their business operations upon the continued use of these patent rights which had been given them by the license agreements. When the Supreme Court, 333 U.S. 364, 68 S.Ct. 525, determined these license agreements to be violative of the Act, these licensees were placed in an uncertain and perilous position. They were operating based on the licenses which were declared violations of the Act. They elected to disregard the license agreements and to continue use of the patented devices and methods.

We think a close parallel—if not indeed a here controlling guide—is to be found in the two Hartford-Empire cases, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 and 324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198. In 323 U.S., 65 S.Ct. one of the two broad issues was whether "the provisions of the decree [are] right". 323 U.S. at page 392, 65 S.Ct. at page 378. The District Court had appointed a receiver of Hartford *pendente lite,* whose duties included receipt of royalties from patent licensees under existing licenses from Hartford. A provision of the decree was that these royalties should be repaid to the licensees when the decree became final. In disposing of this provision, the Court, 323 U.S. at page 411, 65 S.Ct. at page 386 directed that the receivership should be wound up; and "The royalties paid to the receiver by Hartford's lessees may, unless the District Court finds that Hartford has, since the entry of the receivership decree, violated the anti-trust laws, or acted contrary to the terms of the final decree as modified by this opinion, be paid over to Hartford. In any event Hartford should receive out of these royalties compensation on a *quantum meruit* basis, for services rendered to lessees."

The second appeal, 324 U.S. 570, 65 S.Ct. 815, 816, was upon petition of the Government "for clarification or reconsideration" of the opinion on the prior appeal. The Court, 324 U.S. at page 571, 65 S.Ct. at pages 816, 817, quoted from its prior opinion what we have just above quoted. The Court, 324 U.S. at page 572, 65 S.Ct. at page 817, disposed of the matter as follows:

"The Government points out that had it not been for the receivership, many of the licensees (most of whom were not parties to the proceeding) would have paid no further royalties to Hartford, and that they may be able to justify refusal of payment of any royalties from the date of the receivership, and ought not to be put into the position of recovering royalties paid to the receiver, from Hartford.

"It has been open to each of these licensees at any time to repudiate its lease and license, to return the leased machinery, to refuse to pay further rentals or royalties, and to defend any suit arising out of such refusal to pay, *either for infringement or otherwise.* [Italics added.] It may be that licensees have not taken this course because they relied on the decree as entered by the District Court. In such reliance they may have expected that the moneys paid the receiver would be repaid to them.

"In view of the modifications required by the opinion of this court, such licensees must pay reasonable rental and service charges on a *quantum meruit* basis, (leaving out of consideration any amount otherwise payable for the privilege of practicing the patented inventions involved) in respect of the machines used in the interim. Unless Hartford, since the entry of the decree by the District Court, has been guilty of some added violation of the anti-trust laws, licensees must elect (a) to remain licensees on such reasonable rental and royalty basis for the future as the District Court may fix, or (b) repudiate the leases and litigate their rights as against Hartford to retain any portion of the rents and royalties paid. Depending upon such election of each of the lessees, the District Court may, on the application of each, make an appropriate order for the disposition

of the fund in the light of the licensees' election and the principles stated in the opinion of this court."

The here particularly applicable part of this quotation is "In view of the modifications required by the opinion of this court, such licensees must pay reasonable rental and service charges on a *quantum meruit* basis *(leaving out of consideration any amount otherwise payable for the privilege of practicing the patented inventions involved)* in respect of the machines used in the interim" [italics added].

We think it a fair deduction from the sentence just quoted, that the Court had in mind the differences in the bases of recovery in *quantum meruit* and for infringement; and also the differences in measurement of damages or recovery for infringement [13] and on *quantum meruit*. The prayer on these infringement Counts is for "not less than a reasonable royalty."

▆▆ Both because of the practical and legal situation here, and, also, the teaching in Hartford-Empire case, we think the Final Decree should be modified to cover prohibition from prosecuting the USG suits in so far as they are based on patent infringement during the period covered by those suits.

Count III of USG petitions is a common law action of *indebitatus assumpsit* based on a pleaded express contract. That contract and the relief sought are so stated and designed to bring about the identical recovery that would be realized had the actions been for recovery upon the royalties provided in the illegal agreements. This is but a left-handed, indirect method for recovering such royalties.[14] "Forms of action are a means of administering justice rather than an end in themselves * * *" 1 Am. Jur. p. 439. The Decree should be modified to enjoin prosecution of these Counts (Count III).

Count IV of USG petitions is for *quantum meruit* covering the use of the patents. Under the Hartford-Empire opinion, 324 U.S. 570, 572, 65 S.Ct. 815, we think this Count is proper and prosecution thereof should not be enjoined unless USG is barred by unpurged misuse of its patents.

## IV—MISUSE AND PURGE

In all that we have heretofore stated in this opinion, we have laid aside consideration of the related issues of misuse of patents by USG and of purge of misuse. These issues are now to be examined. We shall first state the pertinent legal rules and then the factual situation to which the rules are to be applied.

▆▆ *The Law.* It is an age-old doctrine of Equity Jurisprudence that equity will deny use of its powers to a wrongdoer. This is the doctrine of "unclean hands". This rule is applicable where the owner of patent rights seeks to extend those rights beyond the limits of his patent monopoly. This is the doctrine of "misuse" of patents. This does not nullify the patent but prevents enforcement of it. Because of the nature of patent grants and because of the nature of this equity doctrine, such owner may, as to *future* protection of his rights and after the baleful effects of the misuse have been fully dissipated, relieve

13. This infringement Count V in the USG is brought under 35 U.S.C.A. § 67 now §§ 281, 284, which authorizes up to treble damages recovery. These Counts allege willful, deliberate and persistent infringement.

14. This situation reminds of the expression in International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20, where the Court stated: "* * * The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market. When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed."

himself of this impediment by ceasing the unlawful use. This is the doctrine of "purge". These rules apply to whatever the form of the suit by the patent owner may be, Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 399–400, 67 S.Ct. 416, 91 L.Ed. 374.[15]

*The Facts.* The issues as to facts are: (1) whether there was misuse; (2) whether, if there was misuse, it is shown as matter of law; and (3) whether, if misuse existed, it is shown, as matter of law, to have been purged before this period or is yet an undetermined issue of fact.

We think there was misuse by USG, as matter of law on the facts here, which has not been purged. The reasons for these conclusions follow. The Supreme Court, 333 U.S. 364, 68 S.Ct. 525, determined that USG had misused its patents to create various unlawful restraints effecting monopolization of the entire gypsum industry. This misuse extended to price regulation, to suppression of related or similar unpatented products, and to regulation of methods and agencies of distribution. The effective instrumentalities used by USG were patent license agreements containing various restrictive provisions.

One such provision (covering prices) had not been used for some years (since 1941) but the right to use had not been abandoned but expressly retained.

In connection with formation of the first decree (November 7, 1949), USG op-posed strenuously a suggested provision declaring the license agreements "illegal, null and void". It contended the provision should go no further than to declare the "minimum price provisions" of the licenses to be "illegal" and that the licenses be *"hereby cancelled and terminated,"* suggesting that the broader provision had the purpose to relieve the licensees "from accounting with respect to anything done before or *after* the decision of the Supreme Court" [italics added].

On the appeal of the defendants, 339 U.S. 960, 70 S.Ct. 996, that Court enjoined defendants "from enforcing in any manner whatsoever the provisions of their current license agreements * * *." This order was made May 29, 1950 and continued in force until the Final Decree (May 15, 1951).

In each of the present USG suits, Counts I and II are expressly based on the old license agreements and seek to recover the royalties provided therein in the amounts provided for and measured by those agreements. Counts III and IV are, respectively, actions of *indebitatus assumpsit* and *quantum meruit* posed on the same underlying factual situation created by the license agreements. The amounts sought in each of those two Counts is precisely the same as stated in Counts I and II—in Count III, the amount is measured as in the agreements. Count V (also Count VI in Newark and Ebsary suits) is for infringe-

---

15. Some of the cases applying or illustrating the limits of the matters in this paragraph are United States v. National Lead Co., 332 U.S. 319, 335, 67 S.Ct. 1634, 91 L.Ed. 2077; Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219; Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 399–402, 67 S.Ct. 416, 91 L.Ed. 374; Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 645, 67 S.Ct. 610, 91 L.Ed. 563; Hartford-Empire Co. v. United States, 324 U.S. 570, 571–572, 65 S.Ct. 815, 89 L.Ed. 1198; Hartford-Empire Co. v. United States, 323 U.S. 386, 414–419, 65 S.Ct. 373, 89 L.Ed. 322; Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 665–672, 64 S.Ct. 268, 88 L.Ed. 376; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 175, 63 S.Ct. 172, 87 L.Ed. 165; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 491–494, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 461–463, 58 S.Ct. 288, 82 L.Ed. 371; Altoona Publix Theatres v. American Tri-Ergon Corporation, 294 U.S. 477, 493, 55 S.Ct. 455, 79 L.Ed. 1005; Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 31–35, 51 S.Ct. 334, 75 L.Ed. 819; Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 256 et seq., 29 S.Ct. 280, 53 L.Ed. 486.

ment based on deliberate infringement and praying recovery for an amount ("not less than a reasonable royalty") which exactly equals the amount measured by the unlawful agreements.

We think this course of conduct, as clearly shown by the proceedings of record in the Anti-Trust case and in these suits by USG, must be construed as meaning that USG has continued to misuse its patents by seeking recovery, directly and indirectly, on the illegal license agreements up to this time. We think we should exercise our discretion and entertain these petitions on the ground of preventing a multiplicity of actions which affect the complete effectiveness of the Final Decree; and that USG should be enjoined from further prosecution of these actions.

USG urges that "this Court on the record before it knows of a number of facts any one of which constitutes evidence of purge at a time prior to May 15, 1951." USG then discusses five of such facts, with the reservation that they are "only illustrative and not the only or exclusive facts showing purge." In spite of this cautionary reservation, we must conclude that USG is presenting here those matters which it regards as most potent in showing purge.

The first of these five is that USG did not fix prices, under its licenses, after July 8, 1941. This is true. However, its effect is dissipated by two considerations: first, the notices that minimum prices bulletins would be suspended included the statement that such suspension would continue "until we decide again to exercise our right to do so";[16] and, second, this price fixing provision is inseparably joined with the other provisions found violative of the Act, Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380.

The second claimed purging act is based on the claimed acquiescence of USG to the repudiation of the illegal agreements by Petitioners following the first appeal, 333 U.S., 68 S.Ct. The record herein does not support the claim that USG "acquiesced" in these cessations of payments by Petitioners. The position of USG at that time is more accurately described, by one of its counsel, at the argument before us.[17] Thereafter, nothing appears bearing on "acquiescence" until the hearings (June 14, 1949) and the memoranda in connection therewith in respect to the summary judgment and resultant form of decree to be entered thereon. In that connection, USG not only did not claim that the licenses had been rescinded but it urged strongly that only the minimum price fixing provisions were illegal and that, in all other respects, the license agreements should be "cancelled" only as of the date of the decree to be entered. At that time and thereafter, it made clear that it expected to have and waived no rights to have "compensation" for the use of its patents; however, there was no suggestion as to what form enforcement of those rights would take if not

16. The "potential power", Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852, remained.

17. Counsel stated that the first decision of the Supreme Court, 333 U.S., 68 S.Ct., "came as quite a shock to the old industry. We were not expecting that. And everybody stopped in their tracks as far as these license agreements were concerned.

"The licensees stopped paying royalties. They stopped making reports. As National in its petition sets out, they stopped doing anything under the license, because the Supreme Court had held them unlawful.

"U.S.G. likewise did nothing to try to enforce the license agreements. We just sort of were in a status quo during that period there as far as taking any action. No action was taken by us to enforce them. And that is why, in answer to your question, I wanted to postpone it to explain that situation. And that was that no effort was made to audit the books, no royalties were paid during this three-year period that is involved in this litigation out in Iowa, and New Jersey, and New York."

voluntarily paid. Not until these USG suits were filed was that made clear. Such suits included Counts for recovery under the unlawful agreements. Throughout, there is no basis for this claimed "acquiescence".

The third claimed purging act is the offer by USG, early in the Spring of 1949 (February or March), of new forms of licenses. Those proffered forms of licenses are not effective as acts of purge, as to our period, for two reasons. First, they were not intended to become effective until the entry of the decree because it was not until that time that the unlawful license agreements were to be "cancelled and terminated" (Article IV, 2 of the form of decree submitted by USG on March 4, 1949). Second, they differed in several respects from the form approved by the Supreme Court, 340 U.S. 76, 71 S.Ct. 160. That Court, 340 U.S. at page 90, 71 S.Ct. at page 170, found the definition of gypsum board too restrictive; and also the time limit for applying for new licenses, 340 U.S. at pages 93, 94, 71 S.Ct. at pages 171, 172.

The fourth claimed act of purge is that USG had decided not to appeal from the decree of November 7, 1949, "unless the Government appealed, in which event it felt it would be required to appeal, in self defense." Why either this unacted upon decision not to appeal or why an appeal by the Government should in any way affect this matter of purge is not clear to us. The two appeals (USG and the Government) involved entirely different legal issues and situations. USG appealed from the entry of any decree "on the ground of their right to introduce material evidence", 340 U.S. at page 82, 71 S.Ct. at page 166; the Government appealed solely "in its effort to have the provisions of the District Court decree enlarged." 340 U.S. at page 82, 71 S.Ct. at page 166.

The fifth purging act (or situation) is that the Supreme Court, 339 U.S. 960,

70 S.Ct. 996, enjoined USG, on May 29, 1950, from "enforcing in any manner whatsoever" the price provisions of the license agreements.[18] USG relies upon Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, 927, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149, and the two Hartford-Empire cases, 323 U.S. 386, 411, 65 S.Ct. 373 and 324 U.S. 570, 572, 65 S.Ct. 815. In none of these citations was there found any attempt to extend unduly a patent monopoly beyond the entry of the final decree in the anti-trust litigations there involved. In each of these cases, the doctrine of patent misuse and purge was recognized but was found not effective in the situation then before those Courts. The USG suits now pending show conclusively that even yet it is striving to enforce the royalty provisions of the illegal patent license agreements.

We think such an attempt is clear misuse of its patents; that such misuse yet continues; and that to allow prosecution of these suits would weaken the effectiveness of the Final Decree. As to *quantum meruit* Counts of the USG petitions, we think it will be sufficient if we enjoin further prosecution on the basis of preventing recovery in a multiplicity of suits wherein the misuse of the patents which were involved in this Anti-Trust suit is shown, as matter of law, to exist and not have been purged.

## CONCLUSION

Our ultimate conclusions upon the issues here are as follows: (1) that we have jurisdiction to entertain and determine the issues presented by Petitioners; (2) that the Final Decree should be modified as indicated in point "III—Modification" of this opinion; (3) that further prosecution of all Counts of the USG suits should be enjoined.

Petitioners are granted thirty days from the filing of this opinion, to serve upon opposing counsel and to file with

---

18. While not material in connection with this contention of purge, it is true that this injunction went beyond price fixing and extended to "by license or other concerted action arranging the terms and conditions of sale thereof [gypsum board]."

this Court, suggested form of decree and form of Conclusions and Findings.

COLE, Judge (dissenting).

In reaching a different conclusion from that presented in the majority opinion, I find it advisable to present this statement of my reasons therefor, which statement becomes brief because of the excellent rehearsal by my colleagues of the background and present status of this litigation.

As so aptly stated by the United States, in its brief, "of course, when a court's jurisdiction is drawn in question this is the threshold question in the case." This litigation was initiated, as the title indicates, by the United States as the sole plaintiff and was against the defendants now appearing as defendant petitioners herein except USG which appears as defendant respondent thereto; also, initially, it had as its basis the protection of the public interest in enforcing provisions of the anti-trust laws. The final judgment, entered therein after many years of intensive litigation, found against all defendants in language clear, concise, and completely capable of interpretation to meet any applicable situation growing out of the relationship which was the subject matter thereof. *Inter alia*, it adjudged unlawful under the anti-trust laws of the United States, and illegal, null and void each of the license agreements listed in the decree.

It is my view that the United States can be the sole spokesman for the public interest. Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co., 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155. While there have been situations, such as in the case of Missouri-Kansas Pipe Line Co. v. United States, 312 U.S. 502, 665, 61 S.Ct. 666, 85 L.Ed. 975, which might be construed, to some extent, as tending to contradict the rule laid down in the Buckeye case, supra, I do not so regard it.

Article X of the decree in this suit is quite broad in providing that the parties may apply to this Court "at any time for such orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this decree, and (2) for the enforcement of compliance therewith," but this does not, in my opinion, contain the right for the defendants to stand in the shoes of, or even with, the United States as a protector of the public interest in litigation of this character and, in so doing, settle their own private differences. Likewise, such litigation, initiated by the United States, will not permit the main action to be encumbered with extraneous issues of a private nature. United States v. Columbia Gas & Electric Corporation, D.C., 27 F.Supp. 116.

The opposite viewpoint looks for support to Missouri-Kansas Pipe Line Co. v. United States, supra [312 U.S. 502, 665, 61 S.Ct. 669], which was an anti-trust proceeding wherein a consent decree was entered under which consent decree a stockholder of the defendant corporation had the right to become a party which right he sought to exercise. The Attorney General approved the plan presented by the petitioner for modification of the original decree. It is significant that the court in dealing with this phase of the litigation said:

"* * * This, we are told, 'is believed to satisfy the public interest', and so the Government desires to sustain the action of the court below without further litigation. We recognize the duty of expeditious enforcement of the antitrust laws. But expedition cannot be had at the sacrifice of rights which the original decree itself established. We assume that the district court will adjust the right which belongs to Panhandle with full regard to that public interest which underlay the original suit.

Following a rehearsal of the chronological course this lengthy controversy pursued, the United States, in its brief, made this statement:

"It is, of course, probable that the courts in which suits have been

brought will give effect to this Court's judgment and dismiss, because of the judgment, all claims based on the voided license agreements. \* \* \*

\* \* \* \* \* \*

" \* \* \* The position of the United States, as set forth in its petition, is that said final judgment bars enforcement of any claim based in whole or in part upon any license agreement thus adjudged null and void, and that suit to recover upon any such claim constitutes an attempt to defeat the Court's final judgment. The petition prays, by way of relief, that this Court enjoin USG from asserting any claim and from maintaining, instituting, or threatening to institute any action, based in whole or in part on any license agreement which the Court had adjudged illegal, null and void.

"The United States stated in its petition that *it takes no position as to whether USG's alternative claims for recovery on a quantum meruit basis or for infringement, as made in the four foregoing actions, are barred by this Court's final decree of May 15, 1951*, or as to whether this Court should enter an order enjoining USG from prosecuting such alternative claims." [Italics supplied.]

Just why this court, under the circumstances, should feel called upon, in view of the Government's position, to restrain prosecution of the pending suits in the several district courts and take upon itself the adjudication of the controversy between the defendants when that controversy involves issues, such as the right to recover under *quantum meruit* or infringement, as alleged, when the Government as the sole protector of the public interest in litigation of this character does not join the petitioners in such request for this court to do so, but by inference at least suggests that it is beyond the scope of the decree handed down in these proceedings, I do not appreciate. If this court restrained the prosecution of the pending suits to the extent the Government's position finds the recovery sought herein to be within that prohibited by the final decree, the right, if any, to the petitioning defendant, USG, to recover under *quantum meruit* or infringement would have remained for adjudication in the district courts. Thus, the suits pending therein would continue as presently docketed for trial. Also, the several district courts wherein the suits are now pending are quite capable of construing and interpreting the meaning of the judgment passed in these proceedings, as applied to the pleadings and factual record subsequently to be developed in those courts, and rule thereon accordingly.

I do not find the situation before us as one requiring this court to spell out in supplementation of its original decree every conceivable type of litigation which might develop between the defendants and presumed to have grown out of the relationship stricken down. Neither do I find the existing situation to be one calling for resort to Article X of the judgment by this court in order to construe, carry out, or enforce said judgment. Inherent power rests with this court always in proceedings of this character to enforce its judgments when such appears advisable. I do not, however, find need for the application of such power in these proceedings.

In the light of the foregoing expression of my views, I find it unnecessary to discuss other points argued in the case.