# UNION PACIFIC RAILROAD COMPANY *v.* MASON CITY AND FORT DODGE RAILROAD COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 31. Argued November 2, 1911.—Decided December 11, 1911.

The object of the provisions in acts of July 25, 1866, 14 Stat. 244, c. 246, and of February 24, 1871, 16 Stat. 430, c. 67, for the construction of railway bridges across the Mississippi and Missouri rivers was that the trains of all railroads terminating at the rivers should be allowed to cross on reasonable terms, and for the more perfect connection of railroads running to the bridges on either side of the river; and, the statutes being construed in that light, the approaches on both sides of the river must be regarded as parts of the structures. :

A railroad bridge can be of no use to the public unless united with the necessary appurtenances for public accommodation.

A distance of four miles in the scheme of the Union Pacific Railroad may be reasonably within the expression "at or near."

The decree of the Circuit Court affirmed by this court in 199 U. S. 160, gave to the Mason City and Fort Dodge R. R. Company the right to cross the Union Pacific bridge over the Missouri river and this included the use of main and passing tracks over and approaching the bridge to the extent necessary to constitute a continuous line from the terminus at Council Bluffs to the point at Omaha mentioned therein, but the decree did not give the Mason City Road any rights to use other tracks and terminal facilities of the Union Pacific Railroad.

165 Fed. Rep. 844, reversed.

THE facts, which involve the construction of a decree of the Circuit Court in regard to the joint use of railroad tracks between Omaha and Council Bluffs, are stated in the opinion.

*Mr. Maxwell Evarts*, with whom *Mr. N. H. Loomis* was on the brief, for appellants.

*Mr. John Barton Payne* for appellee.

MR. JUSTICE McKENNA delivered the opinion of the court.

The question in the case is whether the decree of the United States Circuit Court for the District of Nebraska, rendered in a suit brought by appellee against the Union Pacific Railroad Company in 1903, which adjudged to appellee and to its lessee, the Chicago Great Western Railway Company, the equal and joint use of the main and passing tracks of the Union Pacific, means the use of such tracks in connection with the bridge of that company over the Missouri river between Omaha and Council Bluffs, or the tracks independently of such use, or, in other words, a general use of the tracks for business having no connection with the bridge or use of it, or, to be more specific and to bring forward the particular use claimed, whether, as facilities for elevators established by appellee in Omaha "and generally for a grain terminal," or as shall be necessary or convenient in its business as a common carrier, it may operate its own motive power and use the tracks of the Union Pacific to deliver cars to the Chicago, Rock Island & Pacific Railroad, which has connection with the tracks of the Union Pacific. The appellee contends that such right is given by the decree. The appellants assert that the Union Pacific alone has the right to deliver cars to appellee's property or take them from it to connecting carriers, as it does, it is contended, for all other railroads, according to contracts which have obtained for many years.

The Circuit Court decided that the decree gave the use, contended for by the appellee, and adjudged appellants guilty of contempt for obstructing such use. The decision was affirmed by the Circuit Court of Appeals. 165 Fed. Rep. 844.

The decree adjudged that appellee and its lessee, the Chicago Great Western Railway Company, were "admitted into the full, equal and joint use of the main and passing tracks of the Union Pacific Railroad Company, now located and established, or which may hereafter be located and established, from the eastern terminus of said tracks in Council Bluffs, in the State of Iowa, to a connection with the Union Stock Yards Railroad and the other railroads connecting with the Union Pacific Railroad at South Omaha, in the State of Nebraska, including the bridge over which said tracks extend across the Missouri River between the cities of Council Bluffs, Iowa, and Omaha, Nebraska; also the connection with, and the tracks pertaining thereto, of the general passenger station of the said Union Pacific Railroad in Omaha, and said passenger station and all tracks and facilities connected therewith; also a connection with the side or spur tracks leading from the main line to the lower grade of the sidings and spur tracks in Omaha, and such extensions as may be hereafter made; also a connection with the side tracks in Omaha on which to receive from and deliver to said Union Pacific Railroad Company freight which may be handled through the warehouses, or may be switched by the said Union Pacific Railroad Company; also the connections with the Union Stock Yards tracks in South Omaha, and with the tracks of all other railway companies which now or may hereafter connect at or near South Omaha, with the tracks of the Union Pacific Railroad Company hereinbefore described, each and all, to the same extent and upon the same terms and conditions stated in the contracts between the Union Pacific Railroad Company and the Chicago & Northwestern Railway Company, the Chicago, Milwaukee & St. Paul Railway Company, and the Chicago, Rock Island & Pacific Railway Company, as appears by the contracts in evidence in this case, and the depot contract, and the supplemental con-

tract between the same parties, being Exhibits 6 and 7, attached to the bill of complaint herein, without preference or discrimination."

It is manifest that the rights of appellee and its lessee company which were adjudged by the decree are measured by the rights of the other railroads mentioned in the decree, and what they were are defined in certain cases in which they came up for consideration.

The first of the cases was *Union Pacific Railway Co.* v. *Chicago, Rock Island & Pacific Railway Co.*, 163 U. S. 564. It was brought by the Chicago, Rock Island & Pacific Railway Company against the Union Pacific Railroad Company to compel specific performance of a contract in regard to the use of the tracks of the latter. The following is a summary of the facts: The Union Pacific Company controlled and operated more than five thousand miles of railroad, and, among others, a main line extending from Council Bluffs, Iowa, by way of Omaha and Valley Station, Nebraska, to Ogden, Utah, a distance of about eleven hundred miles, and other roads not necessary to mention.

The Rock Island Company owned and operated a line of railway extending from Chicago, by way of Davenport, Iowa, to St. Joseph, Missouri, and thence, through certain points, to Colorado Springs and Denver. It also operated other lines, amounting in the aggregate to more than three thousand miles. The St. Paul Company was operating more than six thousand miles of railroad, and one of its lines extended from Chicago to Council Bluffs.

The Rock Island Company determined to connect its lines from Chicago to Council Bluffs with its southerly line to Colorado Springs by constructing a bridge across the Missouri river at Council Bluffs and a railroad from that terminus, by way of Omaha and South Omaha and other points, thereby shortening its line from Chicago to Denver. The St. Paul Company joined in the under-

taking in order to extend its line from Council Bluffs on to Omaha and South Omaha. The two companies, to execute their purpose, caused a corporation to be created under the laws of Iowa, with power to build a bridge across the river at Omaha, Congress granting to the corporation the necessary franchise. Act of June 12, 1884, 23 Stat. 43, c. 82. Pending the making of the surveys and other preparations, the Union Pacific Company proposed to the companies to make with them a trackage arrangement by which they could use the bridge and tracks of the Union Pacific Company between Council Bluffs and South Omaha for their terminal facilities in Omaha and South Omaha, and the continuous line desired by the Rock Island Company could be completed. The proposal was accepted and the contracts subsequently drawn. The preamble to the Rock Island Company contract recited that that company had become a domestic corporation of Nebraska, and proposed to extend its railway from its terminus at Council Bluffs to a connection with its leased line, the Chicago, Kansas & Nebraska Railway, at the city of Beatrice; that the parties to the contract believed that the interests of all would be promoted by using for a part of said extension the main tracks of the Union Pacific Railway Company in the cities of Council Bluffs and Omaha, the bridge over the Missouri river and portions of certain other roads not necessary to mention.

The specific and material provision was as follows, the italics being ours: "The Pacific Company hereby lets the Rock Island Company into the full, equal and joint possession and use of its *main and passing tracks*, now located and established, or which may be hereafter located and established, between the terminus of such tracks in the city of Council Bluffs, in the State of Iowa, and a line drawn at a right angle across said tracks within one and one half (1½) miles southerly from the present passenger station of South Omaha, in the State of Nebraska, includ-

ing the *bridge* on which said tracks extend across the
Missouri River, between said cities of Council Bluffs and
Omaha; *connections* with Union Depot tracks in Omaha,
the side or spur track leading from its main tracks to the
lower grade of the Pacific Company's sidings and spur
tracks in Omaha, and such extensions thereof as may be
hereafter made; side tracks in Omaha on which to receive
from and deliver to the Rock Island Company freight
that may be handled through the warehouses, or switched
by the Pacific Company; *the connections* with the Union
Stock Yards tracks in South Omaha, and conveniently
located grounds in South Omaha, on which the Rock
Island Company may construct, maintain and exclusively
use a track or tracks, aggregating three thousand (3,000)
feet in length, for the storage of cars and other purposes,
for the term of nine hundred and ninety-nine (999) years."
The consideration is expressed, and it is provided "that
the Pacific Company lets the Rock Island Company into
the full, joint and equal possession and use of its tracks,
stations and appurtenances along the line of the railway
of the Republican Valley Company," the Pacific Company
reserving the right to admit any other company to the
joint use and possession of the same tracks and property
upon substantially the same terms.

Performance of the contract was entered into. Sub-
sequently a change of management of the Pacific Company
took place, and that company forcibly prevented the Rock
Island Company and the St. Paul Company from using
the tracks at Omaha, which they were entitled to use under
the contracts, and absolutely refused to perform the con-
tracts.

Suit was then brought by those companies to compel
specific performance of the contracts, and the Pacific
Company set up as a defense that the contracts were
*ultra-vires,* and that the use of its road, as claimed, would
deprive it of the means granted to it by the act of Congress,

of earning money with which to maintain its corporate existence, perform the duties of a common carrier and meet the demands of the Government. The defenses were not sustained, and it was decreed that the contract was "the valid obligation of the parties thereto, and should be performed in good faith by each of them;" that it secured the several rights embraced therein, all of which were specifically set forth, subject to certain limitations which need not be given. 47 Fed. Rep. 15. The decree was affirmed by the Circuit Court of Appeals. 51 Fed. Rep. 309.

The case in this court was considered on the appeal of the Rock Island Company, the court saying that if the decree in favor of that company be affirmed a like result must follow in the case of the St. Paul Company, and stated the questions to be (p. 580) "whether these contracts are within the corporate powers of the parties; were duly authorized as respects the Union Pacific Railway Company; were such contracts as a court of equity can specifically enforce; and were properly enforced on the merits." More specifically, it was said (p. 581) that it could be remarked "in the outset that the main contention of the Pacific Company concerns the tracks between Council Bluffs and South Omaha, including the bridge." This, then, we must accept as the subject of the controversy to which the court addressed itself and by which the decision must be explained.

It was decided that the contracts were not *ultra vires,* the court basing its decision upon the general powers of the Pacific Company in relation to the subject-matter and its duties as a common carrier, and decided that there was no reasonable ground upon which it could "be held invalid as an unlawful assumption of power." But the court, going beyond such general operation and relation, said: (p. 585) "But the determination of the existence of the power to grant running rights in this instance does not rest on these considerations," and based its decision

as well upon the provisions of the Pacific Railroad acts relating to the bridge over the Missouri river and its construction and operation, holding that those acts "imposed on the Pacific Company the duty of permitting the Rock Island Company to run its engines, cars and trains over the bridge and tracks between Council Bluffs and Omaha." And the court said (p. 586) "that South Omaha was included."

These propositions were announced: The original charter of 1862 required the construction of the Pacific road from the east bank of the river, and so impliedly authorized the company to bridge it. The implication was made express by the amendatory act of 1864; and the company given authority "to construct a bridge over said Missouri river." The bridge was for the company's road, and no provision was made for other roads, nor were special means provided for the construction of the bridge. By 1871, several roads had been built from the East to Council Bluffs, and others were in process of construction in Nebraska, with Omaha as their terminus. On February 24 of that year the Omaha Bridge Act was passed (February 24, 1871, 16 Stat. 430, c. 67), in which it was provided that "for the more perfect connection of any railroads that are or shall be constructed to the Missouri river, at or near Council Bluffs, Iowa, and Omaha, Nebraska," the company was authorized to issue bonds not exceeding two and one-half million dollars and to "secure the same by mortgage on the bridge and approaches and appurtenances, as it may deem needful to construct and maintain its bridge over said river, and the tracks and depots required to perfect the same, as now authorized by law of Congress."

The act further provided that for the use and protection of the bridge and property the company should be governed and limited by the act of Congress of July 25, 1866, 14 Stat. 244, c. 246, in regard to the construction of cer-

tain bridges and to establish them as post roads.   Nine bridges were authorized by that act to be constructed, eight over the Mississippi river and one over the Missouri river, and it was provided in § 1 of the act which authorized the construction of the bridge across the Mississippi at Quincy, Illinois, that when constructed the trains of all railroads terminating at the river should be allowed to cross, for reasonable compensation to be made to the owners of the bridge.   This provision was made applicable to the other bridges.

The court said (p. 587): "The common object of both these acts plainly was the more perfect connection of roads running to the bridges on either side of the river;" and this, it was further said, was in harmony with the numerous acts of Congress referred to in the opinion of the Circuit Court of Appeals.

Answering the objection that if these acts justified the granting of the use of the bridge it did not justify the granting of the use of the tracks, the court remarked that the authority was given to place a mortgage "on the bridge and approaches and appurtenances," and that it would seem clear that the approaches on both sides of the river must be regarded as a part of the structure.   And it was further said (p. 588): "Moreover, the act refers to 'the tracks and depots required to perfect the same.'   A railroad bridge can be of no use to the public unless united with necessary appurtenances, such as approaches, tracks, depots and other facilities for the public accommodation. And we consider Council Bluffs, Omaha and South Omaha, under the facts, as necessarily embraced in the intention of Congress.   It is true that it appears that from the depot to the point in South Omaha where the tracks of the companies connected, is about four miles; but the scheme of Congress was to accomplish the more perfect connection 'at or near Council Bluffs, Iowa, and Omaha, Nebraska,' and we think this distance reasonably within the terms

of the act of 1871, liberally construed, as the act should be."

The next case which came to this court was *Union Pacific Company* v. *Mason City Company*, 199 U. S. 160. The Mason City Company was complainant in the suit i_ the Circuit Court, and operated a railroad having its western terminus at Council Bluffs, and sought in that suit to connect with and use the bridge, approaches and tracks of the Union Pacific Company upon the same terms and conditions as the roads which were parties to the suit in 163 U. S., *supra.* It based its claim upon the acts therein set out and considered, it having no contract with the Union Pacific as the other railroads had. The Circuit Court and the Circuit Court of Appeals sustained its claim. 124 Fed. Rep. 409; 128 Fed. Rep. 230.

In this court, the Mason City Company contended that its right to the use of the bridge and approaches was determined by the decision in 163 U. S., and, further, that if mistaken in that, it had such right under the statutes of the United States and by the terms of the contract between the city of Omaha and county of Douglas, with which contract we are not concerned. To the contention the Union Pacific replied that so much of the opinion as dealt with the statutory obligation was *obiter dictum.* It also urged that the statutes were misconstrued, and that the status of the present Union Pacific Company differed so much from that of the then defendant as to make them inapplicable.

Disposing of the contention that the reference to the statutory obligation of the Union Pacific was *obiter,* the court said (p. 165):

"While the claim of the plaintiffs in that case was founded directly upon contracts, yet if there were a statutory duty to let them into the joint use of the bridge and its approaches that was enough to sustain a decree in their favor, and the contracts might be regarded as

simply relieving the court of the work of settling minor matters, such as method of use, compensation therefor, and matter of control. Indeed, the alleged invalidity of the contracts was rested largely on the scope of the statutes, and the duties to the Government and the public imposed thereby on the railroad company."

To the contention that the statutes had been misconstrued, the court replied (p. 166) that, "We see no reason to question the conclusion announced in the former opinion." The other contentions were also held untenable. The decree against the Union Pacific was affirmed, with some minor reservations which it is unnecessary to notice.

It was this decree that the Union Pacific Company was, in the present case, adjudged guilty of contempt for violating. The decree we have already set out.

The parties are in sharp controversy as to its meaning, but, necessarily, whatever ambiguity arises from some of its parts, its extent must be determined by what preceded it and what it was intended to execute—in other words, that the bridge act of 1871 is the measure of the rights given by decree in connection with the act of 1866 providing for a bridge across the Mississippi River at Quincy, Illinois, and other bridges. 14 Stat. 244. The latter act, as we have seen, provided that "all trains of all roads terminating at said river at or opposite said point shall be allowed to cross said bridge for reasonable compensation." And, as we have also seen, the act of 1871 was passed "for the more perfect connection of any railroads that are or shall be constructed to the Missouri River at or near Council Bluffs, Iowa, and Omaha, Nebraska." And the powers conferred and the use and protection of the bridge that should be erected were "governed and limited" by the provisions of the act of 1866. The two acts, therefore, express the powers conferred and the obligations imposed on the Union Pacific Company. And this court so construed them, saying, as we have seen, that

"the common object of both these acts was the more per-
fect connection of roads running to the bridges on either
side of the river." A right to the "approaches and appur-
tenances" was given as necessary to the connection and to
make it effective. It did not otherwise subject the prop-
erty of the Union Pacific Company to the use of other
companies. It bridged the river—"the transportation
gap"—between Council Bluffs and Omaha, the country
east of the river and the country west of it. It did no
more. It did not intend to give to other roads a right in
the terminal of the Union Pacific Company beyond what
was necessary for a right of passage over the "gap,"
giving the same continuity to other roads which the Union
Pacific Company had. That the act of Congress had
this object the Circuit Court of Appeals did not deny.
The court said (165 Fed. Rep. 850):

"It is true that the object of the requirement of the
acts of congress was to bridge the transportation gap and
to facilitate the transfer of cars passing between railroads ·
east and railroads west of the Missouri river, but this fact
did not deprive the court which was called upon to enforce
this legislation of its jurisdiction to prescribe the limits
and the terms of the use which the Pacific Company should
allow, nor of its power and duty to exercise a wide and wise
judicial discretion in fixing those limits and terms."

Of course the court had power to pass on the issues pre-
sented to it, and we might have to yield to its decision
as *res judicata* if its decree was as broad as asserted, but
we do not so understand its decree. It gave only what
the Chief Justice, in 163 U. S., called "running rights."
As we have already pointed out, the original charter of the
Pacific road only impliedly authorized the building of a
bridge across the river. The act of 1864 expressly author-
ized it, but the bridge contemplated was for the use of
the Pacific Company only. No provision was made for
other roads. The act of 1871 enlarged the powers of the

company, giving it means to construct the bridge, but at the same time put the obligation on the company of permitting its use by other roads, as we have seen, "indicating [we quote from 163 U. S. 587] a settled policy that all structures of this character should allow connecting roads to cross them with their cars, trains and engines." And this was the right which was given over the tracks, such right over the tracks being necessary to the right over the bridge. *Id.* 587, 588. The right to cross them, bridge and tracks, it will be observed, and thereby provide "for the more perfect connection of the roads east of the river with those west of it." That this was the purpose is expressed in many places in the opinion. The bridge was decided to be the principal and dominating thing, to which the rights in the tracks were accessory and only given as appurtenant and necessary as a means to avail of its use.

The Mason City Company would upset this order and make paramount the use of the tracks; indeed, make the use of the tracks independent of any use of the bridge, though the only rights it possesses are given by the act authorizing the construction of the bridge. It was because its railroad connected with the Union Pacific at Council Bluffs that it was enabled to invoke the provisions of that act. It now claims a right on the west side of the river to the use of tracks in connection with what it terms "a grain terminal" in Omaha, for which purpose it has purchased certain real estate. And it represents "that, in order to provide the necessary elevators and other special facilities, it has purchased other real estate, the title to which it has caused to be conveyed to the Omaha Grain Terminals, a corporation of the State of Nebraska, every share of the capital stock of said corporation being owned by" it. It sets forth, in detail, length of tracks and their connection with those of the Union Pacific, and the number and capacity of the elevators which are necessary to accommodate "the grain business naturally tributary

to the city of Omaha." It also sets forth that, as a carrier
of live stock and live stock products, it must have facilities
"in-close proximity to the South Omaha stock yards." We
quote these averments to illustrate the extent of the rights
claimed. It is to accommodate the business thus de-
scribed and its business as a common carrier that the
Mason City Company asserts the right to use the tracks of
the Union Pacific Company which connect with the tracks
of other companies—specifically, in this case, with the
Chicago, Rock Island & Pacific Railway Company. It
was a prevention of the use of the latter tracks in order
to deliver a car of stucco hauled by an engine of the Mason
City Company to the Rock Island Company that was
held to contemn the decree. If the Mason City Company
had the right to deliver that car it had the right to deliver
all cars, and the court so decreed, finding that there was a
physical connection between the tracks of the Rock Island
and the main tracks of the Union Pacific at South Omaha,
and that by the terms of the decree the Mason City Com-
pany had "the right to run its engines, cars or trains"
over such tracks, and from them "over and through the
said connection on to the tracks of the Union Pacific
Company at South Omaha."

The court, therefore, decided that the decree author-
ized the use of the Union Pacific track for local switching
purposes and enjoined the prevention of such use. As
we have pointed out, we do not think the decree justified
the conclusion of the court. The rights asserted transcend
anything given by the bridge act. The tracks of the Union
Pacific Company, as urged by its counsel, are its property,
and the supervision and control thereof cannot be taken
from it and given to its connections except to the extent
expressed in the bridge act, which gave, as we have seen,
the use of the bridge and of the main and passing tracks
as necessary approaches to the bridge. And it is of special
significance that none of the "tenant companies" (parties

in 163 U. S.) ever claimed such right except in one attempt by the Rock Island, after these proceedings to punish the Union Pacific officers for contempt.

We are, therefore, of opinion that the decree admitted appellee to the use of the "main and passing tracks" of the Union Pacific Company from their eastern terminus at Council Bluffs, only to a physical connection with the roads and at the places mentioned therein, including the bridge over which the tracks extend across the Missouri river between Council Bluffs and Omaha. And that such use was all that was necessary to constitute the road's continuous lines from east to west or from west to east.

> *The decree of the Circuit Court of Appeals affirming the order of the Circuit Court adjudging the appellants guilty of contempt of the decree entered August 12, 1903, is reversed, and the cause remanded to the Circuit Court for further proceedings in accordance with this opinion.*