In re **VERMONT REAL ESTATE INVESTMENT TRUST, Debtor.**

Dr. Felix **SOMMER, Plaintiff,**

v.

**VERMONT REAL ESTATE INVESTMENT TRUST, Defendant.**

Bankruptcy No. 82–33.
Adv. No. 82–0043.

United States Bankruptcy Court, D. Vermont.

Nov. 2, 1982.

814

E. Bruce Weber, Brattleboro, Vt., for plaintiff.

Julian Goodrich, Montpelier, Vt., for defendant.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

### NATURE OF CASE

The instant adversary action arises out of the Complaint to Recover Property filed by the Plaintiff, Dr. Felix Sommer. The basis for the complaint stems from two remittances sent by Dr. Sommer to the Vermont Real Estate Investment Trust (hereinafter referred to as the "Trust"), for the purchase of the Trust's securities. The Plaintiff filed its complaint on March 31, 1982 and submitted a memorandum on April 22, 1982. The parties filed a written stipulation as to the facts on July 29, 1982. At a hearing on that date counsel for the Debtor, Julian Goodrich, indicated that he would file a response memorandum within 30 days. To date none has been filed. The lack of such filing may be due to the pending change of counsel for the Debtor. On October 14, 1982 a supplemental stipulation was filed by the parties and it was approved by William Mikell, counsel for the Shareholders' Committee. It is at this posture that the case currently stands.

### STATEMENTS OF FACTS

The parties have stipulated to the facts regarding the case and, to avoid repetition, the following is a brief summary of the pertinent facts in chronological order.

FRIDAY, January 15, 1982

—Trustees meet with representatives of the accounting firm of Gallagher, Flynn, Crampton & Co., the Trust's accountants, to discuss the letter of January 8, 1982 regarding the difficulties with the management and administration of the Trust.

SATURDAY, January 16, 1982

—Plaintiff, Dr. Felix Sommer, issues two checks payable to the Trust in the amounts of $10,040.00, and $6,024.00, for the purchase of the Trust's securities, as custodian for Bronwen and Elizabeth Sommer, respectively, and deposits such checks to the Trust in the U.S. mails.

MONDAY, January 18, 1982

—The Trust receives the purchase orders and checks from Dr. Sommer; prepares a deposit slip for Shawmut Bank, Boston, for such checks; and sends Dr. Sommer's checks and two others to the Shawmut Bank for deposit by the U.S. mail.

—An evening meeting was held by three Vermont Trustees, at which time the trustees voted to suspend Mr. Crowell from all offices and responsibilities with the Trust; to engage Smith, Batchfelder & Rigg, Certified Public Accountants to determine the financial condition and results of operation of the Trust; and to engage the law firm of Gibson, Noble & Goodrich of Montpelier, Vermont as new legal counsel.

TUESDAY, January 19, 1982

—Rosemary Berkeley, Director of Administration, for the Trust, was given the directive by Austin Noble to suspend all transactions in the Trust's securities shortly after 12 p.m.

—Deposit slip for Shawmut Bank, dated January 19, 1982, is marked cancelled and never mailed to the Shawmut Bank, Boston.

—The checks from Dr. Sommer and the two others are in-transit to the Shawmut Bank.

WEDNESDAY, January 20, 1982

—Shawmut Bank receives the deposit from the Trust, as mailed on January 18, 1982, consisting of Dr. Sommer's checks and two others; the Bank date stamps the checks appropriately; and initiates the processing for collection.

—The Trust records the above-mentioned deposit in their cash receipts journal.

It should be noted that the suspension of stock transactions was done at the direction of the Trustees of the Trust, pursuant to their vote at the meeting on the evening of January 18, 1982. Within a few days subsequent to that meeting, representatives of the Vermont Department of Banking and Insurance conferred with Austin Noble, Counsel for the Trust, regarding stock sales. Mr. Noble assured the Department that no sales would be made until an audit was completed. No sales were thereafter made, and after completion of the audit, the Trust surrendered its license to issue and sell its shares to the Department, at the demand of the Department. Yet, the Trust processed Dr. Sommer's order and payment while voluntarily ceasing all other stock transactions.

It is further brought out in the stipulated facts that neither the Trust or any representative or agent thereof contacted the Shawmut Bank to stop the processing of the in-transit deposits of January 18, 1982; nor did they contact Dr. Sommer to advise him to stop payment of his checks of January 16, 1982. However, all order and checks received by the Trust subsequent to the cessation of business order were returned to the makers thereof, on or about February 5, 1982.

On February 10, 1982, the Trust filed its petition in bankruptcy for reorganization. In filing its petition and schedules, the Trust did not list Dr. Sommer as either a shareholder or creditor, although the amounts of Dr. Sommer's checks are listed in the Trust's schedule of assets. (Schedule B–2(b) Bank Deposits). At sometime subsequent to the filing, Dr. Sommer was listed as a shareholder.

## QUESTION PRESENTED

The Plaintiff, Dr. Felix Sommer, has filed a complaint to recover the monies remitted to the Trust in his checks of January 16, 1982. The Plaintiff asserts that his remittances should be treated as being in a constructive trust held by the Trust, and as such, should not become part of the Debtor's estate under 11 U.S.C. § 541.

I. WHETHER MONIES RECEIVED BY A DEBTOR FOR THE PURCHASE OF SECURITIES, PRIOR TO THE CESSATION OF BUSINESS ACTIVITIES, BUT PROCESSED SUBSEQUENT TO SUCH CESSATION, SHOULD BE TREATED AS PART OF THE DEBTOR'S ESTATE UNDER SECTION 541 OF THE BANKRUPTCY CODE.

■ The determination of whether certain properties should be treated as part of a debtor's estate under section 541 of the Bankruptcy Code can only be made after consideration is given to the Court's jurisdiction over the property in question, and the proper consideration is given to the interests and rights of the debtor in such property. The Plaintiff has more than adequately summarized the legal considerations in his memorandum. However, some additional authority shall be provided herein.

In the instant case, the Debtor has scheduled the funds received from the Plaintiff as an asset under bank deposits. As stated by the Court in the *Matter of Johnson,* 16 B.R. 193 (Bkrtcy.1981) at 195:

> ... it is clear that what are 'properties of the estate' is not a matter to be determined with reference to the schedules filed by the Debtor and whether or not an item of property was scheduled by the

816

Debtor and [1] without significance. Thus, the fact that an item was scheduled by the Debtor as part of his assets obviously does not mean that the particular item is property of the estate...

Whether Dr. Sommer's remittances will remain as part of the estate will have to be determined after a review of the law applicable in this case.

One of the significant changes made by the Bankruptcy Code was the reduced reliance on nonbankruptcy law in determining what is estate property. However, some dependence on nonbankruptcy law is unavoidable. This dependence was noted by the Court in *In Re Hurricane Elkhorn Coal Corp. II,* 19 B.R. 609 (Bkrtcy.1982), where it stated at page 615:

"Bankruptcy courts must still look to state law when determining the existence and nature of a debtor's interest in property; that is, whether a debtor has any legal or equitable interest in an item. But once that determination is made, whether the property will come into the estate is a federal question."

■ In Vermont, "it is a familiar principal in equity that a trust is implied whenever the circumstances are such that the person taking the legal estate, whether by fraud or otherwise, cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing." See *Miller v. Belville,* 98 Vt. 243 at 247, 126 A. 590. This principle affects the interest of the Debtor in the instant case, in that the monies remitted to the Debtor were obtained under the premise that they would be exchanged for securities in the Trust. Even assuming that the Trust could have legally issued and sold its shares on January 19, 1982, it was precluded from doing so by its own Trustees' orders. Therefore, when Dr. Sommer's monies were truly obtained the Trust had suspended its securities transactions. Because of this suspension, the Trust was unable to deal with Dr. Sommer's purchase order and, correspondingly, should not have dealt with his remittances. As such, the funds provided by the Plaintiff should be

subject to a constructive trust held by the Debtor for the benefit of Dr. Sommer.

In addition to the questions of honesty and fair dealing, consideration should also be given to whether Dr. Sommer remitted the checks under a mistake of fact. As was stated by the Court in the case of *In Re Hurricane Elkhorn Coal Corp. II,* 19 B.R. 609 (Bkrtcy.1981) at 613: "Bankruptcy law recognizes that money paid to a debtor under a mistake of fact is impressed with a constructive trust that follows it into the hands of the estate, But as with all trusts in bankruptcy, the trust property must be identified in its original or substituted form; the trust must be traceable."

In the instant action, it is reasonable to assume that Dr. Sommer would not have remitted the two checks to the Trust on January 16, 1982 had he known that the Trust would have been unable to accept his order. It is further reasonable to assume that the funds remitted by the Plaintiff and deposited in the Shawmut Bank account are traceable. As such, a constructive trust should prevail and the funds provided by the Plaintiff should be returned rather than be included in the Debtor's estate under section 541 of the Code.

Another case that appears dispositive of the issue in the instant case, due to its similar nature, is *In Re Bengal Trading Corp.,* 12 B.R. 695 (Bkrtcy.1981). The Court is *Bengal* found that the plaintiff was entitled to a return of his funds. In *Bengal,* the plaintiff wired funds to the defendant-debtor, to buy commodities futures. The plaintiff at the time of wiring the money was unaware that the day before the debtor's president had instructed his personnel to cease trading. Although the bankruptcy trustee returned all customer checks received by him after the cessation, he deposited the plaintiff's funds making the distinction that they had been wired. The trustee took the position that since the funds had actually been deposited, they could no longer be returned but instead that they should be distributed ratably with

1. The word "and" apparently is intended for the word "is".

all the rest of the debtor's property. The Court disagreed. See page 696 as follows:

"This court would agree with the trustee if Bengal had been in a position to do business at the time (plaintiff's) funds were received. However, it was precluded by law from accepting and handling his money at the time it was transferred. Although the wire transfer was accepted by Bengal's bank, the receipt was of no more effect than the receipt of funds accidentally deposited to a wrong account... The funds ... did not come into the bankruptcy estate. Therefore, they must be returned to the plaintiff."

The plaintiff's position is further buttressed by *In Re Specialized Installers, Inc.* (Bkrtcy.D.Colo.1981) 12 B.R. 546, 547 where the Court defines a "constructive trust" at page 553 thus:

"A constructive trust is an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant. It does not require an intent to create a trust. Dobbs, Remedies, § 5.3 at 240 (1973 ed.). Neither actual fraud, nor the existence of a fiduciary relationship need be shown. *Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979); *Weeks v. Esch,* 39 Colo.App. 428, 568 P.2d 494 (1977). However, something more than a mere creditor-debtor relationship must be proved. *In re Penn-Dixie Steel Corp.,* 6 B.R. 817 (Bkrtcy.S.D. N.Y.1980). There must be a relationship of trust and confidence between the parties."

In the instant case there did exist a relationship of trust and confidence between the debtor and Dr. Sommer. As such the latter had the right to expect that the debtor would in fact invest the proceeds of the transmitted checks in securities and in due course deliver to him certificates as indicia of ownership. With the cessation of operations the Trustees of the Debtor were unable to and did fail to carry out their commitment with the end result that a constructive trust was created in the funds for the benefit of the plaintiff. It necessarily

follows that these funds did not come into the bankruptcy estate and must be returned to the plaintiff. In Re Bengal Trading Corp., supra. In Re Hurricane Elkorn Coal Corp. II, supra.

## ORDER

Upon the foregoing, IT IS ORDERED that the debtor return the proceeds of the two checks forwarded to it by the plaintiff on January 16, 1982 by the payment forwith to Dr. Felix Sommer and his Attorney, E. Bruce Weber, of the sum of $16,064.00 with interest at 12% per annum from January 18, 1982 to the date of payment.