**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**Warren R. FRANKLIN a/k/a Ricky Franklin, d/b/a Futures Investment Group, Defendant.**

Civ. A. No. 86–0032.

United States District Court, W.D. Virginia, Danville Division.

Sept. 3, 1986.

Steven W. Widerman, Matthew J. Elkan, Commodity Futures Trading Com'n., Washington, D.C., John P. Alderman, U.S. Atty., Roanoke, Va., Randy W. Sinclair, Fowler, Sinclair & Hurd, Danville, Va., for plaintiff.

James P. Kent, Jr., Kent & Kent, Altavista, Va., for defendant.

Paul J. Pantano, Jr., Metzger, Shadyac & Schwarz, Washington, D.C., equity receiver.

## MEMORANDUM OPINION

TURK, Chief Judge.

This case arises under the Commodities Futures Trading Commission Act ("the Act"), 7 U.S.C. § 1 *et seq.* (1982). The present dispute centers on the Receiver's proposed plan for distributing the remaining funds of 161 investors which have been kept in an insured receivership account. *See* Receiver's First Interim Report ("Report"). The court has jurisdiction of this case pursuant to 7 U.S.C. § 13a–1 (1982). All interested parties were permitted to voice any objections to the plan at a July 30, 1986 hearing. The matter is now ripe for disposition.

## I. BACKGROUND

The unfortunate events leading to this dispute are basically agreed upon by all parties involved. From January 1985 through March 1986, defendant Warren "Ricky" Franklin ("Franklin"), a businessman from Gretna, Virginia, induced 161 private investors to join the Futures Investment Group ("FIG"), a pool which Franklin operated that invested in the commodities market. These investors, many of whom were friends or relatives of Franklin, invested approximately $1.5 million during this fifteen month period. An investor could buy a share in "FIG" for $5,000.

After investigating several complaints that Franklin was illegally operating FIG, plaintiff Commodities Futures Trading Commission ("CFTC") filed a complaint and motion for an *ex parte* order freezing Franklin's assets on March 26, 1986.[1] Franklin had been trading on the Commodities Exchange through two Chicago brokers, Jack Carl Associates, Inc. ("Jack Carl") and Rosenthal & Co. ("Rosenthal"). The complaint alleged that Franklin was operating FIG without registering with the CFTC, thereby violating section 4m of the Act.[2] On March 26, 1986, this court entered an Order freezing all of Franklin's

---

1. The CFTC is an independent regulatory agency of the United States. It was established by the Commodity Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389. The CFTC has the authority and responsibility to enforce the provisions of the Act. *See* 7 U.S.C. § 1 *et seq.* (1982).

2. An amended complaint, filed April 2, alleged that Franklin also engaged in fraudulent practice in violation of 7 U.S.C. §§ 6b and 6o.

assets, prohibiting the destruction of Franklin's records, and ordering him to show cause at an April 8 hearing why a preliminary injunction should not issue. Franklin failed to appear at the April 8 hearing, and this court entered a preliminary injunction against him.

Franklin was personally served with the freeze order on March 26, 1986, and he disappeared from Gretna shortly thereafter. Because Franklin was an extremely inept investor, his $1.5 million in collected funds had dwindled to less than $400,000 on March 26. On March 28, however, just two days after being served with the freeze order, Franklin unexpectedly mailed an additional $199,920.34 to the United Virginia Bank for deposit in his frozen account. *See* Report, Ex. 6. This amount represented 23 checks from FIG investors, some of which were dated as early as March 7, 1986. *See id.*

This court also appointed on April 8, at the request of counsel for the CFTC, Paul J. Pantano as the Temporary Equity Receiver ("Receiver") of the funds remaining in FIG. The Receiver was given the authority to monitor and/or liquidate all open accounts held by Franklin. Immediately after his appointment, the Receiver liquidated the FIG accounts and placed them in a money market account insured by the FDIC. The Receiver has also diligently pursued all of Franklin's assets in an effort to reimburse FIG investors. To date, he has seized or attempted to seize eight (8) bank accounts, four (4) vehicles, several pieces of real property, office equipment and furniture, and $5,000.00 in cash which Franklin left his wife before departing. Several of these properties had outstanding liens and no one item produced an enormous amount of cash. However, the Receiver had accumulated $627,958.05 in the receivership account as of June 20, 1986. Report at 12.[3]

The Receiver has now prepared a summary of Franklin's available assets and a proposed plan for distribution. Among other things, he has proposed that checks deposited on March 28 after the freeze order ("post freeze deposits") be returned in full to the investors who wrote them. The Receiver contends that this deposit was legally prohibited by the freeze order and therefore cannot become part of the pool. He suggests that the remaining funds then be distributed on a pro rata basis. *Id.* at 14.

Numerous investors have objected to this portion of the Receiver's report. At a hearing, Mr. James Rupert argued as a private investor on behalf of at least 84 investors. He argued that *all* of the remaining funds should be distributed pro rata for several reasons: (1) the giving of funds to Franklin, rather than Franklin's deposit to the Bank, made an investor part of FIG; and (2) FIG funds in Franklin's possession were commingled together by him and deposited in no particular order. Several other counsel and investors then echoed Rupert's sentiments. A smaller group of investors, presumably those who stand to gain by the adoption of the Receiver's plan, argued in favor of the proposal. Yet another group representative argued for a derivative of the "FIFO" accounting method,[4] whereby the first investors to join FIG would lose their total investment before successive investors lost any amount.

■ The Receiver has cited several cases in support of his position. He argues that due to this court's freeze order, Franklin was prohibited from transacting any further business with the FIG accounts, whether it be depositing, withdrawing, or trading funds. *See* Report at 7–19. He also argues that in a constructive trust, non-commingled funds such as the post-freeze deposits must be returned before

---

3. Approximately $173,655.79 was apparently spent by Franklin or is otherwise unaccounted for at this time. Report at 13.

4. "First in, first out." Several centuries ago, this concept was referred to as the "rule in Clayton's case." *See generally Ruddle v. Moore,* 411 F.2d 718 (D.C.Cir.1969). It has been widely criticized by, among others, the learned Judge Hand. *See In re Walter J. Schmidt & Co.,* 298 F. 314, 316 (S.D.N.Y.1923).

commingled funds. After much deliberation, the court concludes for the following reasons that this portion of the Receiver's proposal cannot be accepted.

## II. ANALYSIS

### A. The Freeze Order Did Not Prohibit Post-Freeze Deposits

The Receiver contends that the post-freeze deposits must be returned in full because they could not legally have been deposited by Franklin due to the freeze order. However, the language of the order should not be given such a restricted reading. The precise language of the freeze order of March 26, 1986 is as follows:

B. IT IS HEREBY FURTHER ORDERED that all assets of Franklin and FIG be frozen and that they and any of their officers, directors ... or any person in active concert ... with any of them ..., are prohibited from:

1. *Dissipating, concealing, withdrawing, or disposing* of, in any manner, any assets, choses in action, or other real or personal property of Franklin and FIG, ....

Freeze Order of March 26, 1986 (emphasis added).

Plainly, the literal language of the order prohibits only the dissipation or withdrawal of assets from FIG; it would not, for example, prohibit a local philanthropist who sympathized with the defrauded investors from adding $1 million to the existing assets. Neither this court, counsel for the CFTC, nor any other reasonable person suspected on March 26 that Franklin would evidence either remorse or stupidity on March 28 and deposit nearly $200,000 into a frozen bank account. Freeze orders and similar injunctions are designed to "[prevent the] defendant from further dissipating the funds he allegedly has already misappropriated." *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir.1978). Not surprisingly, courts typically freeze accounts without

giving serious thought as to who might *add* to the assets in a frozen account. However, public policy certainly should not discourage an individual from *depositing* funds into a frozen account, especially if the depositor is the same person who effected the fraud in the first place.

■ Therefore, absent explicit language to the contrary, a freeze order should not be construed to prohibit post-freeze deposits by persons aware of the freeze. Cases in which a bankrupt corporation has been required to return checks received after it was ordered to cease doing business are distinguishable. *Cf. In re Vermont Real Estate Investment Trust*, 25 B.R. 813 (D.Vt.1982) (monies remitted to real estate investment trust by investor after trust was precluded from issuing and selling its shares were subject to a contructive trust and therefore not part of the bankruptcy estate); *In re Bengal-Trading Corp.*, 12 B.R. 695 (S.D.Fla.1981) (trustee in bankruptcy must return in full those customer funds deposited after the date the bankrupt corporation was precluded by law from receiving additional customer funds). First, the language of those orders prohibited all business transactions, unlike the order in this case. Second, public policy in those cases demanded the return of late checks, whereas in this case, public policy favors that all investors be treated similarly. Because no explicit language in this court's order forbade additional deposits into Franklin's frozen accounts, the court cannot agree with the Receiver that Franklin "was precluded from conducting further business as of the date of the freeze Order." *See* Report, p. 18. Rather, he was simply forbidden from trading in futures, withdrawing additional FIG money, or otherwise conducting business which might potentially *dissipate* FIG funds. Depositing $199,920.34 could in no way dissipate FIG funds and is thus permitted despite a freeze order.[5]

---

5. This conclusion is bolstered by the fact that the Virginia commercial code does not prohibit a collecting bank from depositing funds in a bank account frozen by a district court. *See* Va.Code §§ 8.4–202, 204 & 207.

## B. All Funds Given to Franklin Were Commingled

The Receiver also concludes that post-freeze deposits should be returned in full because these deposits were not yet commingled with other FIG funds. In support of his proposal, the Receiver quotes the Restatement of Restitution,[6] which provides that funds of one claimant which have been "effectively separated" from the remaining funds should be returned to that claimant.

The court declines to take a broad reading of when one claimant's funds are "effectively separated" from the remaining funds. The evidence has been that Franklin stored each investor's check in his briefcase and used it randomly whenever he desired to make a purchase. Thus, some checks negotiated to Franklin on March 21 were deposited and used for trading prior to the freeze, while other checks given to Franklin on March 10 were not deposited until after the freeze. No one has suggested any mathematical formula or logical reasoning Franklin may have used in selecting these checks. Rather, he apparently grabbed a handful of checks that equalled the total cost of futures or option contracts he wished to purchase on a particular day. Apparently Franklin also deemed it necessary to retain marginal funds in his brief-

case so that he could pay "dividends"[7] to those investors fortunate enough to request them periodically.

These facts suggest that the funds of FIG investors were truly "commingled" even before Franklin deposited them. See Black's Law Dictionary (5th ed. 1979) (defining "commingle" as the "[putting] together in one mass"). As the Receiver notes, these funds were certainly traceable to the extent the drawer's signature appeared on each uncashed check. But to the extent the checks were mixed together in Franklin's briefcase, could be used in any sequence at his discretion, and allegedly "earned interest" from the moment the check was delivered to Franklin,[8] these funds were, in a broad sense, "commingled." Therefore, checks not deposited after March 26 need not be returned in full to those investors simply because Franklin arbitrarily chose to use these funds at a later date. To the extent the Restatement of Restitution, § 213(2) states otherwise, the court declines to follow it in this context.

## C. Constructive Trusts Are Equitable Remedies

Finally, equity dictates that all FIG funds be distributed on a pro rata basis. When legal title to personal property is

6. "Where the wrongdoer has effectively separated the money of one of the claimants, that claimant is entitled to, and only to, his own money or its product." Restatement of Restitution, § 213(2).

7. Franklin informed FIG investors that they could reinvest their "profits" into additional FIG shares or have these "dividends" distributed monthly. In reality, Franklin was paying these profits with the funds of more recent FIG investors who had just "bought into" the pool. These fake profits raised an additional dilemma for the Receiver: (1) these "profits" could be returned to the entire pool prior to the pro rata distribution; (2) these profits could be retained by the fortunate investor, who could still demand a pro rata distribution based on his initial investment; or (3) the invester could retain his distributed "profits", but he would receive a pro rata share only of his initial investment *minus* the profit distribution.

The Receiver chose the third alternative, and the court agrees with this approach. For exam-

ple, an investor who paid $10,000 for two (2) shares, and later received dividends of $1,500, will receive his pro rata share based on $8,500 rather than $10,000. Of the three alternatives, this is clearly the most equitable, and may be required under current case law. See, e.g., In re Tedlock Cattle Co., Inc., 552 F.2d 1351, 1353–54 (9th Cir.1977).

8. Mr. G.L. Simpson, a private investor, testified at the July 30 hearing that when he presented a check to Franklin and joined FIG, Franklin told him he "would be earning interest right now." Theoretically then, it is possible that an investor whose check was retained in Franklin's briefcase for several weeks and who requested that monthly dividends be distributed could have received "profits" before his investment check was ever negotiated. This is another example of Franklin's irrational and unorganized use of FIG funds and further indicates that the funds were "commingled."

fraudulently obtained in Virginia, a constructive trust is imposed upon the property wrongfully obtained. *See Miller v. International Union of United Brewery,* 187 Va. 889, 48 S.E.2d 252 (1948). Constructive trusts are equitable remedies, designed to prevent unjust enrichment. *See* 76 Am.Jur.2d § 222. Funds held in constructive trust must be paid back before other creditors are paid. *See United States v. Fontana,* 528. F.Supp. 137, 146 (S.D.N.Y.1981). In this case, *all* FIG investors may claim a constructive trust because each was a victim of Franklin's fraud.

Because all FIG investors may claim a constructive trust over their investment funds, equity dictates that distribution be applied even-handedly if possible. The unique facts of this case call especially for an equitable distribution. During March 1986, Franklin received sixty-five (65) checks totalling approximately $440,000 from investors. He randomly selected forty-two (42) of these for deposit prior to the court's freeze order on March 26. Meanwhile, the remaining twenty-three (23) investors believed that their funds were being used for trading and earning an immediate return. Instead, their checks were never deposited until two days *after* the freeze order. Returning 100% of the investment might provide a stroke of good fortune to those 23 investors, but it would also draw arbitrary boundaries harmful to the remaining investors. Equitable remedies such as constructive trusts should not perpetuate unreasonable results. Therefore, each FIG investor shall receive the same percentage return on his investment. *See United States v. Benitez,* 779 F.2d 135 (D.C.Cir.1985).

The Receiver's Proposed Distribution Plan shall be partially accepted and partially rejected in an order to be entered this date.[9]

9. Except for the deletion of "A. 2.", which requests the complete return of these post freeze deposits, *see* First Interim Report p. 14, the Receiver's plan is accepted in full. It should be noted that case law dealing with the distribution of frozen commodities accounts is scant indeed, yet the Receiver has done an admirable job of assembling for the court the relevant legal precedent.