**S. Wayne ANDERSON; Dwight E. Jefferson, Plaintiffs–Appellants,**

and

**Commodity Futures Trading Commission, Plaintiff,**

v.

**Calvin P. STEPHENS, Jr.; Charles W. Jones; Eddie Adkerson; Ellis W. Dalton; Calvin R. Tuck; Fred L. Barksdale; Robert C. Pruitt; G.H. Pippin, Appellees,**

and

**Warren R. Franklin, a/k/a Ricky Franklin, d/b/a Futures Investment Group, Defendant.**

**No. 87–2045.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1988.

Decided May 11, 1989.

Luis A. Abreu, Danville, Va. (W. Carrington Thompson, Chatham, Va., Clement & Wheatley, Danville, Va., on brief) for plaintiffs-appellants.

Before RUSSELL and HALL, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

PER CURIAM:

This case presents an appeal by two individuals who invested in a fraudulent commodity futures investment group. They claim that the district court erred by ordering that their checks, negotiated after the futures bank account was frozen, be included with other funds in the account for the purposes of a pro rata distribution to all investors. For the reasons discussed below, we reverse the judgment of the district court.

## I.

Between January 1985 and March 26, 1986, the defendant below, Warren "Ricky" Franklin ("Franklin"), operated the Futures Investment Group ("FIG"), an unregistered commodity futures market. One hundred sixty-one private investors, many of whom were friends or relatives of Franklin, invested approximately $1.5 million in FIG.[1] By March 26, 1986, because of poor investments, Franklin had only $400,000 left of the $1.5 million. *Commodity Futures Trading Commission v. Franklin*, 652 F.Supp. 163, 165 (W.D.Va. 1986).

After receiving several complaints about the FIG, the Commodity Futures Trading Commission ("CFTC"), a federal regulatory agency,[2] filed a complaint in the United States District Court for the Western District of Virginia. The complaint alleged that Franklin had violated the Commodity Exchange Act by operating a commodity pool without being registered by the CFTC. The CFTC moved for an *ex parte* order freezing Franklin's assets, for preliminary and permanent injunctions enjoining his activities as a commodity pool operator, and for other equitable relief. On March 26, 1986 the district court entered an *ex parte* order that granted CFTC access to FIG's books and records and froze all assets of Franklin and FIG.[3] Franklin was ordered to show cause at an April 8 hearing why a preliminary injunction should not issue.

The freeze order was served on Franklin and United Virginia Bank ("UVB"), where Franklin maintained a FIG account, on March 26. On March 27, UVB received a mail deposit from Franklin, totaling $217,320.34, which consisted of twenty-three checks made payable to FIG. Three investors were able to stop payment before their checks were deposited; as a result, the total deposit on March 28 amounted to $199,920.34. The checks issued by appellants S. Wayne Anderson and Dwight E. Jefferson were part of this "post-freeze deposit" on March 28.[4]

On March 31, 1986, the district court appointed Paul J. Pantano as the Emergency Equity Receiver ("Receiver") for FIG. On April 2, 1986, the CFTC filed its amended complaint, alleging fraud. On April 8, 1986, Franklin failed to appear at the scheduled hearing and the district court

---

**1.** An investor could buy a share in FIG for $5,000.

**2.** The CFTC was established by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93–463, 88 Stat. 1389. The CFTC is charged with enforcing the provisions of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (1982).

**3.** The language of the March 26, 1986 freeze order stated in pertinent part:
  B. IT IS HEREBY FURTHER ORDERED that all assets of Franklin and FIG be frozen and that they and any of their officers, directors ... or any person in active concert ... with any of them ..., are prohibited from:
    1. *Dissipating, concealing, withdrawing,* or *disposing* of, in any manner, any assets, chos-

es in action, or other real or personal property of Franklin and FIG,.... (Emphasis added.).

**4.** Franklin apparently carried investors' checks in his briefcase and deposited them in random order when he needed to make a purchase. Thus, checks dated March 21 were deposited before the freeze order, while checks dated March 10 were not deposited until after the freeze order. In March 1986, Franklin had received from investors a total of sixty-five checks amounting to about $440,000. Forty-two of these checks were deposited before March 26, and the remaining twenty-three comprised the mail deposit received by UVB on March 27.

entered a preliminary injunction which restrained Franklin and FIG from continuing business activities.

Following his appointment by the court, the Receiver began to collect and liquidate FIG's assets. The Receiver's Report to the court proposed a distribution plan which provided that all funds deposited in the FIG bank account at UVB after the district court's March 26 freeze order be returned to the originating investors dollar for dollar ahead of distributions to investors whose funds were deposited prior to the freeze order. The Receiver argued that the post-freeze deposit was legally prohibited by the freeze order and thus could not be part of the pool of assets to be distributed among the investors.

On July 21, 1986, several investors whose checks had been deposited before the freeze order filed an objection to the Receiver's proposed plan and requested a hearing. On July 28, 1986, investor Anderson, who had been permitted by the district court to intervene as a plaintiff, filed a motion in support of the Receiver's proposed plan. The district court held a hearing on the Receiver's distribution plan and the subsequent motions, and later, in an order and memorandum opinion, rejected the Receiver's proposal to return the post-freeze order deposits in favor of a plan that called for a pro rata distribution to all the FIG investors. *CFTC v. Franklin,* 643 F.Supp. 386 (W.D.Va.1986). This order subsequently was vacated by an order entered September 24, 1986, but was in effect reinstated by the amended order of November 12, 1986. *CFTC v. Franklin,* 652 F.Supp. 163 (W.D.Va.1986).

On February 18, 1987, the district court ordered the Receiver to make a final distribution and submit a final accounting of all receivership assets in accordance with the formula set forth in the November 12, 1986 Order. Investor Anderson, joined by investor Jefferson, filed this appeal.[5]

## II.

This case presents the narrow issue of whether it was proper for the district court to rule that checks deposited in FIG's account at UVB after entry of the March 26 freeze order were to be included in the Receiver's general account and distributed pro rata among all FIG investors. Finding that the district court erred, we reverse its decision.

In reaching our decision that checks deposited into Franklin's account after the freeze order was issued cannot be included in the amount to be distributed pro-rata among the investors, we find it necessary to review the rationale of the Receiver's plan and the district court opinion. The Receiver's Report recommended that makers of checks deposited after the freeze order receive a refund of 100 percent of those funds, less receivership administrative expenses.[6] The Receiver based his argument on the premise that the purpose of a freeze order was to maintain the status quo and prevent additional losses to customers. *See CFTC v. Muller,* 570 F.2d 1296, 1300 (5th Cir.1978); *CFTC v. Morgan, Harris & Scott, Ltd.,* 484 F.Supp. 669, 678–79 (S.D.N.Y.1979). The Receiver argued that while the freeze order did not prohibit deposits, it did prohibit any withdrawals or transferals of assets and thus was a "legal impediment to the conduct of

**5.** Shortly after Franklin was served with the freeze order, he disappeared from his home. By motion to the court, investor Calvin P. Stephens was substituted for Franklin for purposes of this appeal. Mr. Stephens' deposits to the FIG account were made prior to the freeze order.

**6.** The Receiver proposed that the Receivership's assets be distributed in the following order:

    1. Expenses of administration of the Receivership, including legal and accounting fees;

    2. Return of funds deposited in the FIG account after the Court's freeze order;

    3. Return of residual funds to FIG investors on a pro rata basis. These payments would be made regardless of any purported profits or losses on the investments, and would be reduced by the full amount of any payments that were made to FIG investors as purported profits on their investments;

    4. Claims of the United States, if any, pursuant to 31 U.S.C. § 3729; and

    5. Claims of third party creditors of FIG, if any.

further business by Franklin." Because Franklin could not conduct business after the date of the freeze order, the Receiver reasoned that 100 percent of the funds deposited thereafter ought to be returned to the appropriate investors (less their share of administrative expenses). Thus, Franklin's failure to negotiate certain checks prior to the freeze order resulted in those checks being separated from the pool of assets comprising the FIG account. In making this argument, the Receiver relied on the Restatement of Restitution § 213(2), which states that "Where the wrongdoer has effectively separated the money of one of the claimants, that claimant is entitled to, and only to, his own money or its product." The Receiver reasoned that Franklin, by failing to negotiate the checks before the freeze order, had in effect separated them from the balance in the FIG account.

Although the district court adopted the Receiver's Report in part, it rejected the Receiver's suggestion that 100 percent of the funds from the post-freeze order depositors be returned. Instead, the district court held that FIG's assets would be distributed to all investors on a pro rata basis, based on the total value of the fund on March 28, 1986 and including the post-freeze deposit of $199,920.34. 652 F.Supp. at 168. In reaching this conclusion, the district court read its freeze order as implicitly not preventing deposits to the UVB account. As a matter of public policy, the district court was reluctant to read the freeze order in a manner that would discourage a deposit to a frozen account, especially when the deposit was made by the individual who had effected the fraud. *See* 643 F.Supp. at 389; 652 F.Supp. at 166–67.

The district court distinguished the two cases in point, *In re Vermont Real Estate Investment Trust*, 25 B.R. 813 (Bankr.D. Vt.1982) and *In re Bengal Trading Corp.*, 12 B.R. 695 (Bankr.S.D.Fla.1981), by noting that the freeze orders in those cases prohibited all business transactions, while the order at issue did not specifically prohibit deposits. *See* 643 F.Supp. at 389; 652 F.Supp. at 167. Also, in those cases, public policy favored the return of the checks,

while in this case, the district court believed that public policy dictated that all investors be treated similarly. *Id.* The district court declined to accept the Receiver's argument, based on the Restatement of Restitution, that the post-freeze deposits should be returned in full because those deposits were not commingled with other FIG funds. The court held instead that the funds were commingled as of the time Franklin had possession of the checks. 643 F.Supp. at 390; 652 F.Supp. at 167–68. Thus, because Franklin chose to deposit the checks in an arbitrary fashion, those investors whose checks were deposited after the freeze order were not entitled to a full refund. 643 F.Supp. at 390; 652 F.Supp. at 167–68.

Finally, the district court held that equity dictated that all FIG funds be distributed on a pro rata basis, because *all* FIG investors could claim that their money was held in a constructive trust because of Franklin's fraudulent conduct. 643 F.Supp. at 390; 652 F.Supp. at 168, *citing Miller v. Int'l Union of United Brewery*, 187 Va. 889, 48 S.E.2d 252 (1948). The district court reasoned that it would be more equitable to distribute the funds pro rata rather than have some investors' funds returned in their entirety simply because they had been lucky enough to have had their checks selected by Franklin for the post-freeze deposit. 643 F.Supp. at 391; 652 F.Supp. at 168.

### III.

■ It is well settled that "in an action brought to enforce the requirements of remedial statutes such as [the Commodity Exchange] Act, a district court has broad discretion to fashion appropriate relief." *Muller*, 570 F.2d at 1300. Yet we believe that the district court erred in holding that all FIG funds be distributed on a pro rata basis. Both law and equity dictate that the investors whose checks were deposited after the freeze order are entitled to a full return of their funds.

■ Turning to the language of the freeze order itself, we hold that the freeze

order implicitly prohibited *any* banking activity with regard to the FIG account at UVB. Ambiguity in an order may arise from what is excluded from, as well as what is included in, the four corners of a paper.[7] When such an ambiguity arises from a court's order, as we find it did in this case, it becomes the duty of the reviewing court to construe the order to give it full effect.[8] In our review, we are conscious that "[T]he meaning of an ambiguous judgment or order 'must be determined by what preceded it and what it was intended to execute.'" *Hendrie v. Lowmaster*, 152 F.2d 83, 85 (6th Cir.1945), *quoting Union Pacific Railroad Co. v. Mason City and Fort Dodge Railroad Co.*, 222 U.S. 237, 247, 32 S.Ct. 86, 90, 56 L.Ed. 180 (1911). Clearly, the purpose of the freeze order was to stop all activity of the FIG account. That the language of the order did not specifically prohibit deposits ought not to matter in this case; carrying the district court's interpretation of its order to its logical conclusion, Franklin would have been, in theory, free to continue to make deposits to the account at whim,[9] and free to continue to waste the assets of the FIG investors. The freeze order, in effect, froze the status of the FIG account in an attempt to preserve the status quo of the investors, and we hold that the freeze order suspended all transactions with regard to the account. Because FIG was prohibited from doing business after the March 26 freeze order, the funds deposited after cessation of business rightfully can be retrieved.

Our holding in this case is supported by what scant caselaw there is on this topic. In two cases, investors who deposited money with business entities after those entities had ceased doing business were permitted to recover their funds in full.[10] For example, in *In re Vermont Real Estate Investment Trust*, 25 B.R. 813 (Bankr.D. Vt.1982), a bankruptcy court held that checks received by a debtor for the purchase of securities prior to the cessation of business activities but processed after the cessation would be subject to a constructive trust held by the debtor for the benefit of the purchaser and would not be included in the debtor's estate under the Bankruptcy Code. *In re Vermont*, 25 B.R. at 816–17.

The facts of *In re Vermont* are substantially similar to the present case and thus merit discussion in detail. In *In re Vermont*, an investment trust received in the Monday morning mail two checks written by plaintiff. That afternoon, the trust mailed those checks to its bank for deposit. That evening, the trustees of the trust suspended all stock transactions. On Wednesday, the bank received the checks and deposited them in the trust's account. Neither the trust nor its agents (1) contacted the bank to stop further processing of deposits, or (2) contacted plaintiff to advise him to stop payment on his check. All

---

**7.** Thus, a reviewing court has much more latitude when determining the scope of a court order than, say, when determining the scope of a consent decree. *See, e.g., United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) ("the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it").

**8.** We are, of course, mindful of the inherent deference due a district court when it construes its own order.

**9.** This hypothetical situation is not as absurd as it might initially seem, given Franklin's unexplainable deposit on March 28. Indeed, the district court attributed Franklin's March 28 deposit to "either remorse or stupidity." 643 F.Supp. at 389; 652 F.Supp. at 167.

**10.** *Cf. In re North American Coin & Currency, Ltd.*, 767 F.2d 1573 (9th Cir.), *as amended,* 774 F.2d 1390 (9th Cir.1985), *cert. denied,* 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986), where that court held that funds given by a group of investors to an entity during the time it was conducting business could not be recovered by those investors under a constructive trust theory when the entity subsequently filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code. The court noted that under both Arizona law and the Bankruptcy Code, a constructive trust only can be imposed on property if that property were acquired by actual fraud of the bankrupt, and it found no indication that the entity intended to defraud the investors. 767 F.2d at 1575–77.

orders and checks received after the cessation of business were returned to the investors.

The court in *In re Vermont* held that under state law, "when [plaintiff's] monies were truly obtained the Trust had suspended its securities transactions. Because of this suspension, the Trust was unable to deal with [plaintiff's] purchase order and, correspondingly, should not have dealt with his remittances." 25 B.R. at 816. Thus, the money was subject to a constructive trust held by the debtor for plaintiff's benefit. The court assumed that plaintiff would not have sent his money to the trust had he known that the trust would have been unable to accept his order. The court also noted that the funds deposited in the account were traceable to plaintiff. Thus, the court held that the plaintiff's funds would be returned to him. *Id.*

Similarly, in *In re Bengal Trading Corp.*, 12 B.R. 695 (Bankr.S.D.Fla.1981), Bengal was a commodity futures commission merchant that stopped trading on November 10, 1980 when it was unable to meet certain federally mandated financial standards. On November 11, the plaintiff wired money to Bengal for trading purposes, and the money was deposited in Bengal's account. On November 12, an interim trustee returned all customer checks received by him. The trustee, however, refused to return plaintiff's money, arguing that the wire transfer resulted in an actual deposit in Bengal's account and thus became part of the total "customer property" (defined in 11 U.S.C. § 761(10)) held by Bengal. The court, however, held that Bengal was "precluded by law from accepting and handling [plaintiff's] money at the time it was transferred." 12 B.R. at 696. To the court, the wire transfer had no more effect than the receipt of funds accidentally deposited to the wrong account. Because Bengal could not do business as a futures commission merchant, plaintiff could not become Bengal's customer, and the money could not become customer property. Consequently, the court ordered

that plaintiff's money be returned to him. *Id.*

Although not arising under Virginia law, cases like *In re Vermont* and *In re Bengal* are both instructive and decisive in the case before us. We hold that UVB was precluded by law from initiating any activity with the FIG account after the March 26 freeze order. As a result, the checks comprising the March 28 post-freeze deposit cannot be included in the assets to be distributed on a pro-rata basis.

## IV.

We are not unmindful of what may be interpreted as a disparity in treatment between those individuals whose money was deposited before the freeze order and those individuals whose checks were deposited on March 28. We recognize that all FIG investors will suffer because of Franklin's illegal activities. Yet because of Franklin's random selection of certain checks for deposit on March 28, some investors may suffer less than others. Ultimately, our decision means that each individual whose check was deposited on March 28 will get back the amount of that check, minus administrative expenses, while those individuals whose checks were deposited before the freeze order will most likely recover about 25–30 cents on each dollar invested.[11] However sympathetic we may be to the pre-freeze depositors, we cannot uphold the district court's order to include the post-freeze deposit in the pool of assets to be distributed on a pro rata basis.

We reverse the judgment of the district court and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.

---

11. The record before us indicates that if the post-freeze deposit were included in the final

distribution of assets, each FIG investor would receive approximately 38.4 cents on the dollar.